## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **BRENT EVANS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. _____ |
| | ) | **JURY DEMAND** |
| **VANDERBILT UNIVERSITY** | ) | |
| **SCHOOL OF MEDICINE and** | ) | |
| **VANDERBILT UNIVERSITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## COMPLAINT

Plaintiff Brent Evans, by and through undersigned counsel, brings this action against Defendants Vanderbilt University School of Medicine and Vanderbilt University under the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.*, and Section 504 of the Rehabilitation Act of 1975, 29 U.S.C. § 701, *et seq.*, for breach of contract both implied and express, breach of implied covenant of good faith and fair dealing, negligent misrepresentation, negligent infliction of emotional distress, and injunctive relief.

### JURISDICTION AND VENUE

1.     This Court has both original and supplemental jurisdiction over the subject matter under 28 U.S.C. §§ 1331-1332 and 28 U.S.C. § 1367(a).  The federal claims arise under Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*

1

2. This Court has diversity jurisdiction over this civil action under 28 U.S.C. § 1332 as the Plaintiff is a citizen of Kentucky and Defendants are citizens of Tennessee and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3. This Court should exercise supplemental jurisdiction over the state law claims – breach of contract express or implied, breach of the covenant of good faith and fair dealing, negligent misrepresentation, and negligent infliction of emotional distress – as these claims are so related to the claim in the federal causes of action that the claims form part of the same case or controversy under Article III of the Constitution.

4. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1)-(2) because it is the place where the Defendants reside and where a substantial part of the events or omissions giving rise to the claims occurred.

## PARTIES

5. Plaintiff Brent Evans, is a citizen of Kentucky and currently resides in Nicholasville, Kentucky. Plaintiff was a medical student at Vanderbilt University School of Medicine.

6. Defendant Vanderbilt University School of Medicine ("VUSM") teaches and trains medical students to become licensed medical doctors. VUSM operates, runs, and manages a private medical school and graduate program and accepts federal funding. Its principal place of business is located Davidson County, Tennessee.

2

7.      Defendant Vanderbilt University teaches and trains both undergraduates and professional students. Defendant Vanderbilt University oversees and/or promulgates the policies and procedures of both undergraduate and professional schools and accepts federal funding. Its principal place of business is located in Davidson County, Tennessee.

## FACTUAL ALLEGATIONS

### Brent Evan's Background and Admission to VUSM

8.      In 1999, Plaintiff began feeling depressed and passively suicidal. Around the age of 14, Plaintiff voiced this to his mother and his mother set up an appointment with a clinical psychologist. Plaintiff had approximately three (3) visits with the psychologist. Plaintiff did not have health insurance at the time, his family was unable to pay for future visits.

9.      In 2001, at the age of 16, Plaintiff saw a psychiatrist for the first time, Dr. Anjum Mujahid in Lexington, Kentucky. Dr. Mujahid diagnosed Plaintiff with Major Depressive Disorder. Dr. Mujahid prescribed Plaintiff with anti-depressants, which he has taken continuously since his diagnosis.

10.     In 2005, Plaintiff transferred from Fordham University to Vanderbilt University as an undergraduate student. From 2005-2007, Plaintiff became a patient at Vanderbilt's Psychological and Counseling Center ("PCC") as an undergraduate student. Plaintiff was treated by Dr. Casey Arney, a psychiatrist at Vanderbilt. Between 2005-2007, Plaintiff also started seeing a therapist, Dr. Vida Sobie, at the Vanderbilt PCC for cognitive behavioral therapy.

3

11.     In 2007, Plaintiff graduated summa cum laude from Vanderbilt University with the academic degree of Bachelor of Science in Neuroscience.

12.     Upon graduation in May 2007, Plaintiff moved back to Lexington, Kentucky where he worked in research at the University of Kentucky and studied for the Medical College Admission Test ("MCAT"). In 2008, Plaintiff scored a 32 out of 36 on the MCAT. Throughout the period of 2007-2009, Plaintiff continued antidepressant therapy as prescribed by various primary care providers.

13.     In July 2009, Plaintiff matriculated at Vanderbilt University School of Medicine. Plaintiff reached out to PCC voluntarily seeking treatment for recurrent Major Depressive Disorder. Plaintiff reached out to PCC to establish a regime of continued mental health care in-line with the care he received as an undergraduate at Vanderbilt University. He continued to see Dr. Casey Arney as a professional student.

14.     In October 2009, Plaintiff started seeing Dr. Paula Nunn at PCC as Dr. Arney had left Vanderbilt. Plaintiff also met repeatedly with Dr. Scott Rodgers, Dean of Students at VUSM, to discuss Mr. Evan's Major Depressive Disorder and the treatment Plaintiff was receiving for it. Both PCC and VUSM were aware of Plaintiff's disability and his continuous treatment for his disability.

15.     In 2010, Plaintiff resumed seeing Dr. Vida Sobie for cognitive behavioral therapy. Plaintiff continued to see Dr. Sobie until she left Vanderbilt for private practice.

16.     In 2011, Plaintiff sought treatment from Dorothy Gager, LCSW and MDiv (pastoral care) who specialized in alcohol and drug counseling. Plaintiff was concerned he was using alcohol more than usual, and at the recommendation of Dr. Nunn, worked with Ms. Gager to establish safe alcohol use patterns. Plaintiff also attended Alcoholics Anonymous. Plaintiff returned to healthier alcohol use.

17.     From 2009 until 2012, Plaintiff's academic performance was excellent. Plaintiff passed all of his first-year classes. During his second year, he received Honors and Passes for all classes. During his third year, Plaintiff received Honors in all clerkships except surgery in which he received a high pass.  Plaintiff intended on matching in a dermatology residency, one of the most competitive and difficult matches at VUSM.

18.     In July 2012, Plaintiff started his fourth and senior year of medical school. He completed his July dermatology clinical and received Honors. He completed his August dermatology clinical and received Honors. In September, Plaintiff completed a third dermatology clinical and again received Honors. October 2012 was an "open month" where Vanderbilt medical students were not required to take any classes or complete any clinical work.

### Plaintiff's Disabilities and VUSM's Actual Knowledge About His Disabilities

19.     As stated, in October 2009, Plaintiff started seeing Dr. Paula Nunn at PCC for therapy and treatment. Plaintiff also repeatedly met with Dr. Scott Rodgers, Dean of Students at VUSM, to discuss Plaintiff's Major Depressive

5

Disorder and the treatment Plaintiff was receiving for it. Both PCC and VUSM were aware of Plaintiff's disability and his continuous treatment for his disability.

20.     In November 2012, Plaintiff suffered a severe relapse of his Major Depressive Disorder.

21.     During November 2012, Plaintiff was involved in an Emergency Medicine course. Due to his depressive relapse exacerbated by unfortunate transportation, financial, and familial events, Plaintiff missed multiple shifts and activities necessary for credit in the course.

22.     Both VUSM and the Department of Emergency Medicine were aware of Plaintiff's disability. Despite this knowledge, VUSM and the Department of Emergency medicine were extremely critical of his performance in the Emergency Medicine clinical.

23.     From December 2012 through January 2013, Plaintiff attempted to remediate the Emergency Medicine course. Plaintiff could not seek adequate psychiatric care or counseling during this time due to the rigors of the VUSM coursework. VUSM became increasingly inflexible about Plaintiff's absences. Consequently, it became increasingly difficult for Plaintiff to respond to emails and to focus on his assignments.

24.     The Emergency Medicine course directors brought Plaintiff's absences to the attention of the Chair of Emergency Medicine, Dr. Corey Slovis. Plaintiff's work product and attendance had rapidly declined. He was not offered any

6

assistance by PCC or VUSM. The Department of Emergency Medicine was aware of his current relapse of Major Depressive Disorder.

25.     As a consequence of his absences, Plaintiff was asked to complete additional assignments. These assignments were not expected of other students enrolled in the course. Plaintiff was also ordered to write a letter of apology to the Department of Emergency Medicine for his performance.

26.     Plaintiff's anxiety and depression increased. Plaintiff sought the counsel of Dr. Scott Rodgers, the Associate Dean of Student Affairs, through in-person meetings between November 26, 2012 and December 16, 2012. Plaintiff inquired as to how he should approach Emergency Medicine and manage his severe depression and the increased course requirements. Plaintiff was told to "fix the problem" and to remediate the missed coursework, otherwise, he would not graduate from VUSM and he would "never match into dermatology." Plaintiff was also told that the Department of Emergency Medicine would be "doing [Plaintiff] a favor by letting him remediate the course instead of failing him," which was "what [his] performance warranted."

27.     During these meetings, Dr. Rodgers did not make Plaintiff aware of his option to withdraw from the Emergency Medicine course at any point *prior* to the final grade assignment and course closure (a timeframe between November 2012-January 2013). It was not until a later meeting with Dr. Kim Lomis in January of 2013, that Plaintiff became aware of the option to withdraw. Plaintiff received a failing grade in his Emergency Medicine course.

7

28.     On December 14, 2012, Plaintiff received an email from Dr. Rodgers regarding an upcoming meeting of the Promotions Committee in which the Committee would discuss his failing grade. The Promotions Committee of VUSM is a committee that reviews each student for satisfactory progress in the medical school program.

29.     On December 16, 2012, Plaintiff attempted to formally withdraw from Emergency Medicine so that he could re-take the course in Spring 2013. Plaintiff's request was denied. However, Plaintiff had the option to withdraw until January 2013, at which time the course would formally close.

30.     On December 16, 2012, Plaintiff wrote an email to the Promotions Committee at Vanderbilt explaining his performance in Emergency Medicine. In his letter, Plaintiff detailed the unfortunate events that triggered his inability to complete his coursework, promptly respond to administrative contacts, and improve his attendance.

31.     On December 17, 2012, the Promotions Committee placed Plaintiff on academic probation for his failing grade in Emergency Medicine. While Plaintiff received a passing final examination grade, his inconsistent participation and submittal of assignments caused him to receive an "F" for the course. The Promotions Committee consequently placed Plaintiff on academic probation.

32.     The Promotion Committee's decision to place Plaintiff on academic probation was based on his "failure to communicate properly with the Emergency Medicine course director and administrator [Director of Undergraduate Medical

8

Education, Emergency Medicine Dr. Camiron Pfennig].” The Committee’s decision stipulated that the “probation will continue until [Plaintiff had] successfully completed the requirements for the Emergency Medicine course.” The Promotions Committee also recommended that Plaintiff seek support through the PCC, an action which Plaintiff had already taken when establishing his mental health protocol shortly after his acceptance to VUSM.

33. On December 18, 2012, Dr. Lomis emailed Plaintiff to express that “she has heard of some concerns about his recent behavior.” Dr. Lomis invited Plaintiff to speak with her about his condition.

34. On December 21, 2012, Plaintiff met with Dr. Lomis. In this meeting, Plaintiff again detailed his struggles with his Emergency Medicine course and his severe depression. Plaintiff reiterated in his meeting with Dr. Lomis, what he had expressed in his December 16, 2012 letter to the Promotions Committee, that “personal/family/financial issues [had snowballed] over the past month or so.”

35. Throughout January 2013, Plaintiff was given the option by Dr. Phennig, the Emergency Medicine course director, to remediate the shifts he had previously missed. Plaintiff missed several of the make-up activities in the course in his attempt to keep up with the rigors of the course and his additional assignments. During this time, Plaintiff had no accommodations or special consideration despite the Emergency Medicine Department’s full knowledge of the severity of his disability. During this time, Plaintiff fell deeper into his depressive state.

9

36.     On January 23, 2013, Plaintiff sent an email to Dr. Lomis and asked to meet with her concerning his missed lectures. He explained that he missed his lectures due to traveling associated with interviews for his residency placement. As underscored in a Final Report written on March 6, 2013, by Compliance Manager Mr. Michael Carter from Vanderbilt's Equal Opportunity, Affirmative Action, and Disability Services Office ("EAD Final Report"), Plaintiff did not mention any medical condition or disability in his correspondence with Dr. Lomis. However, Plaintiff at this point, had notified VUSM and Defendant Vanderbilt University multiple times of his Major Depressive Disorder. Defendants were fully aware of Plaintiff's disability.

37.     On January 23, 2013, Plaintiff received an email from Dr. Rodgers apologizing for the lack of respect and concern for shown for Plaintiff by both himself and VUSM regarding Plaintiff's disability. In this email, Dr. Rodgers admitted to mistakes in giving Plaintiff appropriate feedback and appropriately advocating for Plaintiff at the time when Plaintiff requested aid and advice. Dr. Rodger's email was not mentioned in Mr. Carter's EAD Final Report. This report was later used by the Faculty Senate Committee in considering whether to dismiss Plaintiff from the medical school.

38.     On January 24, 2013, Plaintiff submitted the required letter of apology to the Department of Emergency Medicine, to the course director Dr. Pfennig, and the Chair of the Department of Emergency Medicine, Dr. Corey Slovis. Dr. Lomis asked Plaintiff to submit his letter to her secretary for editing. Dr. Lomis advised

10

Plaintiff that his health condition "must be a temporary lapse" and that he must still complete all course requirements.

39.     Plaintiff struggled to meet the course requirements set forth by the Promotions Committee. Plaintiff was not offered accommodations despite his increased course workload. Plaintiff's depression became more severe and he became less responsive.

40.     On January 28, 2013, Plaintiff was asked to sign a Memorandum of Understanding ("MOU") that outlined the expectations of him moving forward in the Emergency Medicine course.

41.     On January 31, 2013, less than three days after Plaintiff signed the MOU, VUSM cited that "Brent had already violated several of the conditions of the MOU (i.e., missed activities, failed to communicate with the Dean, did not submit assignments)." These violations were noted in the EAD Final Report by Mr. Carter. Throughout this period, Plaintiff was not offered accommodations or leniency for his Major Depressive Disorder despite VUSM's knowledge of his disability. Plaintiff was still asked to complete not only the assignments for the course, but additional assignments not given to other students in the course.

42.     On February 5, 2013, Plaintiff met with Dr. Lomis. As detailed in Dr. Lomis' meeting notes, Plaintiff was "late for the 9:00 a.m. meeting" as he had missed the shuttle to the school. As noted in the EAD Final Report by Mr. Carter, Dr. Lomis asked Plaintiff "whether [he felt] his depression [was] impairing his ability to meet obligations." Mr. Carter omitted Plaintiff response in his report. Mr.

11

Carter detailed in his report Dr. Lomis' direction to Plaintiff to contact the EAD to enroll in the Disability Services Program. Mr. Carter further detailed Plaintiff's response to this suggestion: "If I have to be designated as disabled. I don't mind trying out that option. Even if that looks like I've become my former step-father. Who lives off SS Disability payments he got because he was too depressed/anxious to work." Plaintiff felt shame regarding his disability. This was not noted in Mr. Carter's EAD Final Report. Mr. Carter's report was later used in the Faculty Senate Committee's decision to dismiss Plaintiff from the medical school.

43. On February 6, 2013, Dr. Lomis sent an email to Plaintiff stating, "My first priority is your health…It is important for us to understand whether you need any accommodations." That same day, Dr. Pfennig sent an email to Plaintiff notifying him that he received a passing grade of 72% for the Emergency Medicine course. Dr. Pfennig also noted that Plaintiff had not submitted documentation of his absence at a lecture on January 31, 2013, and a class on February 5, 2013.

44. A day later, On February 7, 2013, Dr. Lomis sent an email to Plaintiff's roommate asking if he had seen Plaintiff. According to Dr. Lomis, this was "due to Brent's apparent distress, absence, and lack of response to her email the previous day." Plaintiff responded later that day detailing to Dr. Lomis that he had a new cell phone number as the old cell phone had been disconnected. Plaintiff also informed Dr. Lomis that he had accidentally slept through a lab scheduled for earlier that day. Plaintiff mentioned that he had been told by VUSM that he should "consider being declared disabled." At this point, Plaintiff had on more than one

occasion notified VUSM of his Major Depressive Disorder. Plaintiff was not offered any assistance.

45. On February 11, 2013, Dr. Lomis sent an email to Plaintiff stating that she was informed that Plaintiff was not present for the Primary Care clerkship. Plaintiff explained that he was not present because he did not get confirmation of where he was to attend his shift. Dr. Lomis noted that it was "unacceptable" for Plaintiff to not have determined the location of the course prior to his first day. Plaintiff still had no accommodations or consideration for his Major Depressive Disorder.

46. On February 14, 2013, Dr. Lomis met with Plaintiff. Plaintiff informed Dr. Lomis that he had seen Dr. Nunn for additional psychological and medical evaluations. He reported having "disrupted sleep secondary to depression and anxiety around the current situation with his education." He also detailed he was actively involved in the EAD process and that Dr. Nunn would send a letter to EAD regarding recommended accommodations later that day. At this point, VUSM and Vanderbilt University, had known Plaintiff was suffering from Major Depressive Disorder for over ten (10) years.

47. On February 14, 2013, Dr. Nunn submitted further medical documentation of Plaintiff's disability to the Disability Services Program. Mr. Carter's paraphrase of Dr. Nunn's February 14, 2013 letter in his EAD Final Report stated that:

Brent had been treated for Major Depressive Disorder Recurrent, a condition that *recently* 'relapsed with worsening depression. (Emphasis added.)

Dr. Nunn's correspondence further stated:

[Plaintiff's] [c]urrently depressive symptoms are severe and include depressed mood, hypersomnia, increased appetite, weight gain, hopelessness, decreased concentration, loss of energy, decreased motivation, social withdraw, and suicidal ideation. He is having difficulty waking up on time and attending classes and shifts for his medical school courses…Due to his condition. It is recommended that he be allowed to have excused absences for medical appointments, attendance, leniency, and assignment extensions.

48. Had Plaintiff been made aware of the opportunity to withdraw from the Emergency Medicine course in November of 2012 by Dr. Rodgers in their counseling sessions regarding Emergency Medicine, Plaintiff could have sought mental health care during the months of December 2012 and January 2013 and avoided the stress of course remediation during his severe depressive relapse. Plaintiff could have completed the entire Emergency Medicine course in March 2013 and graduated on time in May 2013.

49. On February 14, 2013, EAD Disability Services Specialist Corinne Gilliam sent an email to Plaintiff with contract paperwork for the Disability Services Program and directions to attend an orientation meeting the next day, February 15, 2013. He was asked to bring a copy of his Spring 2013 class schedule. Plaintiff was also given a list of Vanderbilt's *Patient Rights & Responsibilities*. These *Patient Rights & Responsibilities* stipulated that "as a patient at Vanderbilt University Medical Center," Plaintiff had the right to "receive care in a safe setting,

14

free from any form of abuse or harassment" and "a fair and objective review of any complaint [he had] against [his] health plan, doctors, hospitals, or other health care personnel." These *Patient Rights & Responsibilities* also state that Plaintiff would have the right "to be involved in all aspects of [his] care and to participate in decisions regarding [his] care."

50.     On February 15, 2013, Plaintiff met with Ms. Gilliam at her office. At the conclusion of the meeting, Ms. Gilliam informed Plaintiff that he had been enrolled in the Disability Services Program. He was told that the accommodations requested by Dr. Nunn on February 14, 2013, would be made available to him.

51.     Ms. Gilliam later told EAD she could not recall meeting with Plaintiff. Ms. Gilliam denied the meeting with Plaintiff despite the fact that the EAD had on file a *New Student Registration* form and a *Student Disability Services Request Form* from Plaintiff dated February 15, 2013, submitted for the Spring Semester of 2013.

52.     As noted in Mr. Carter's EAD Final Report, Ms. Gilliam stated that *had* she met with Plaintiff, she would have reviewed the Disabilities Service paperwork with Plaintiff and explained how Plaintiff could secure accommodations. She also stated that EAD would have a copy of the paperwork. EAD had a copy of Plaintiff's paperwork. Plaintiff, however, was not informed about the process for obtaining accommodations by Ms. Gilliam.

53.     Ms. Gilliam is no longer employed by Vanderbilt.

54.     On February 28, 2013, the EAD sent an email to Dr. Rodgers stating that Plaintiff had completed the required paperwork to register with their office. They stated that before they moved forward with offering accommodations, they needed to know whether Plaintiff was on medical leave. Dr. Rodgers responded that Plaintiff was not currently on leave. Dr. Rodgers proceeded to email Plaintiff and detail that the Promotions Committee would need to approve of a medical leave of absence and re-entry into the program. Dr. Rodgers stated that the Promotions Committee would have the "ability to establish some conditions as a part of the leave." Dr. Rodgers informed Plaintiff that the request for a medical leave of absence must be made by March 15, 2013.

55.     On March 4, 2013, Plaintiff communicated with VUSM his need for a medical leave of absence to treat his depression. By this time, Dr. Rodgers and Dr. Lomis had both made it clear to Plaintiff that if he did not take a medical leave of absence, VUSM would dismiss Plaintiff from the VUSM program.

56.     On March 8, 2013, Dr. Rodgers communicated with DSP Director Tiffany Culver regarding Plaintiff. Dr. Rodgers expressed that he "thought that Brent might believe he is on medical leave," however, Rodgers noted that "this had not formally happened." He also detailed that he had been unable to reach the Plaintiff because he was "off the grid."

57.     On March 25, 2013, the Promotions Committee meeting considered Plaintiff's request for a leave of absence from VUSM. This meeting occurred despite the March 8, 2013, communication between Dr. Rodgers and Tiffany Culver

16

detailing that Plaintiff had not formally requested a medical leave of absence. Mr. Carter's EAD Final Report omitted both the time and date of Plaintiff's formal filing on March 4, 2013. Mr. Carter's EAD Final Report was later used by the Vanderbilt Faculty Senate Committee in their decision to dismiss Plaintiff from the VUSM program.

58.     On March 25, 2013, the Promotions Committee agreed to grant Plaintiff a leave of absence until March 2014 pending the acceptance of several conditions.

59.     On April 12, 2013, Plaintiff met with Dr. Lomis and Dr. Rodgers to sign the necessary documents for his medical leave of absence. Plaintiff voiced concern about several of the conditions. Plaintiff asked for time to consider the conditions and discuss them with his family. Dr. Lomis and Dr. Rodgers denied Plaintiff's request for time to reflect on the document. Dr. Lomis and Dr. Rodgers told Plaintiff that if he didn't sign the document immediately, the Promotions Committee could vote to dismiss him from the VUSM program as soon as that day. Despite his reluctance, and out of fear of dismissal, Plaintiff signed the agreement. He disagreed with the following provisions:

    a. **Requirement to see only physicians authorized by VUSM and comply with any treatment they prescribed.** VUSM stipulated that Dr. Kathy Fuchs, who had never treated Plaintiff as a patient, oversee his treatment along with Dr. Nunn. In addition to Dr. Fuchs who was Nashville based, VUSM recommended only

17

Nashville based treatment providers for Plaintiff Major Depressive Disorder. This made Plaintiff's compliance with any treatment and requirements of VUSM exceedingly difficult during the course of Plaintiff's medical leave of absence, at which time he would be living in Kentucky. VUSM refused to allow Plaintiff to see local providers in Kentucky.

b. **Requirement that Plaintiff receive treatment that was outside the standard scope of practice.** In particular, VUSM stipulated that Plaintiff attend a six (6) to eight (8) week residential treatment program for his major depressive disorder. All residential therapy options were cost prohibitive and would not meet the therapeutic standards and treatment recommendations set out by VUSM. While other treatment options were available, Plaintiff was not allowed to pursue those options. Because Plaintiff was not able to pursue this course of action due to its psychological and financial strain, his "noncompliance" with this stipulation would later be listed among his "failures" to comply with the requirements stipulated by VUSM resulting in his dismissal from the VUSM program.

c. **Requirement to release Plaintiff's physicians' confidential records to VUSM regarding his care.** Plaintiff had to sign multiple waivers of his privacy rights as a patient. It was later

revealed to Plaintiff that VUSM contacted provider Dr. Nunn regularly to discuss his "compliance."

d. **Revocation of all credits earned during the first three months of Plaintiff's fourth year of medical school including a course Plaintiff successfully completed in 2014.** By rescinding these credits, VUSM extended Plaintiff's program by an entire semester.

e. **Stipulation that Plaintiff abide by the requirement of "honesty for all interactions and exchanges" and adhere to "professionalism in every aspect of [his] training."** The language of this document suggests that VUSM interpreted Plaintiff's actions as having a propensity for dishonesty and that his actions lacked professionalism. Plaintiff's actions were a function of his Major Depressive Disorder. The language within these documents was used against Plaintiff throughout the remainder of his time in the program and in VUSM's final dismissal decision.

This document, although signed in 2013, remained in effect until Plaintiff's final dismissal in 2017. Plaintiff objected to these requirements and requested modification. VUSM denied his requests.

60. Plaintiff went on a leave of absence for the 2013-2014 academic year. He was cleared by his psychiatrist to return in January 2014.

61.     On February 3, 2014, the Promotions Committee granted Plaintiff's request to extend his leave of absence through the end of April 2014. In order for Plaintiff to return, VUSM required a continuation of Plaintiff's academic probation through completion of his repeated fourth year. Tuition was waived for Plaintiff's final year at VUSM.

62.     On September 14, 2014, Dr. Nunn faxed a letter to Dr. Bonnie Miller, Senior Associate Dean for Health Sciences Education requesting that Plaintiff be retroactively withdrawn from Emergency Medicine. Plaintiff did not request that Dr. Nunn send this letter. When Dr. Nunn informed Plaintiff that a letter was sent on his behalf, she relayed to Plaintiff that other students in her care who had similar issues to Plaintiff had been allowed by their programs to withdraw. Dr. Nunn expressed surprise to Plaintiff that VUSM had not allowed this in the beginning.

63.     In September of 2014, Plaintiff attempted to return to his program from his medical leave of absence. Prior to his return, Plaintiff was receiving sub-standard psychiatric care in Kentucky as he was required to see Nashville based care providers. His treatment at that time consisted of infrequent phone calls to Dr. Nunn and one or two in-person visits.

64.     During September of 2014, Plaintiff enrolled in a Child and Adolescent Psychiatric clerkship. He had difficulties with his attention due to his depression and missed the course start date. He also failed to contact the attending physician. He was given permission by VUSM to start two (2) weeks late. Plaintiff also missed

20

two (2) to three (3) days without seeking prior approval. Despite this, Plaintiff successfully completed the course and received a grade of High Pass.

65.     In October 2014, Plaintiff decided to return to his medical leave of absence out of an abundance of caution to his education and his patients. He spoke extensively with Dr. Miller about his decision and informed her that his Major Depressive Disorder was still not in remission. He also explained he was having financial difficulties due to an unpaid balance on his student account and unexpected expenses associated with moving between Kentucky and Tennessee.

66.     In October 2014, Plaintiff moved back to Kentucky for his medical leave of absence. While he was required under his March 2013 agreement with VUSM to see Dr. Nunn, Plaintiff started to explore options for additional therapeutic providers, as his depressive state was unchanged. Plaintiff also explored options for obtaining health insurance in Kentucky.

67.     By December 2014, Plaintiff had not registered for any courses at VUSM.

68.     On December 5, 2014, Dr. Lomis informed Plaintiff that the Promotions Committee would meet on February 12, 2015 to recommend that he be dismissed from VUSM for "failing to make satisfactory progress toward the degree."

69.     On February 11, 2015, Plaintiff was contacted by Dr. Nunn. Dr. Nunn stated that the Promotions Committee would be meeting to consider his dismissal. The Committee told Dr. Nunn that Plaintiff would need to request an extension of

his medical leave of absence in order to avoid expulsion. Dr. Nunn recommended that Plaintiff extend his medical leave of absence.

70.     On February 12, 2015, Plaintiff emailed Dr. Lomis to request an extension of his medical leave of absence. He explained that he was still suffering from Major Depressive Disorder which had been exacerbated by further socioeconomic hardships. He also stated that as soon as he was fully enrolled in a Kentucky insurance plan, he would enter a treatment program. Plaintiff reiterated his commitment to following VUSM's requirements in order to graduate and become a practicing physician.

71.     On February 12, 2015, Dr. Lomis presented Plaintiff's letter to the Promotions Committee. The Committee voted unanimously against granting a medical leave of absence. The Committee also voted unanimously to dismiss Plaintiff from school. Plaintiff was informed of his option to appeal the Committee's decision.

72.     On February 26, 2015, Dr. Lomis sent an email to Plaintiff stating that the Committee noted that "Brent had failed to meet the conditions outlined in Brent's original MLOA. Specifically, the Committee found that Brent did not follow through on the recommended treatment, he did not respond to queries in a timely manner, and he failed to meet attendance requirements."

73.     On April 22, 2015, Plaintiff appeared before the Executive Committee to appeal his dismissal from VUSM. Plaintiff detailed to the Executive Committee his struggle with Major Depressive Disorder and substance abuse. He also

explained that he had not been adequately treated during the course of his prior medical leave of absence, due to the restrictions placed on him by VUSM as to satisfactory treatment options. He relayed that he had since obtained Kentucky health insurance and identified appropriate therapy in the state of Kentucky.

74.     On April 22, 2015, the Executive Committee overturned Plaintiff's dismissal and recommended that Plaintiff be placed on a medical leave of absence so that he could receive appropriate treatment. The Executive Committee removed the requirement that Plaintiff follow the treatment plan of Dr. Nunn and Dr. Fuchs and allowed him to seek care locally. VUSM still required that Plaintiff see Dr. Nunn, despite the fact that she was not involved in the care of Plaintiff at that time. VUSM contacted Dr. Nunn each month afterwards to ensure that Plaintiff was compliant with this requirement.

75.     In August of 2015, Plaintiff completed a dual diagnosis treatment program at Recovery Works in Georgetown, Kentucky.

76.      In July of 2016, Plaintiff returned to full time coursework. He completed five (5) courses toward the eight (8) required to graduate. Plaintiff obtained grades of High Pass and Honors in each course. There were no complaints regarding his performance or professionalism.

77.     On August 19, 2016, Plaintiff sent an email to Dr. Miller requesting a retroactive withdraw from his Emergency Medicine course. Plaintiff explained that his depression was the cause of his poor performance. He also explained that he had

not been informed by Mr. Rodgers that withdrawing from the course was an option. Dr. Miller granted Plaintiff's request for retroactive withdraw on August 22, 2016.

78. From November 2016 to January 2017, Plaintiff was not enrolled in any classes at VUSM as he was interviewing for residency programs.

79. At the beginning of February of 2017, Plaintiff enrolled in a Community Health course. He started the course without incident. He was present in all required coursework for the first three days. The faculty expressed no concerns about Plaintiff.

80. On Friday, February 10, 2017, Plaintiff missed two (2) hours of lecture and a tour of the Nashville Women's Shelter. Plaintiff mistakenly used the clinic schedule instead of the lecture schedule and believed he had the Friday off and had scheduled a 12 Step Program retreat. He had left town Thursday, February 9, 2017. He had limited phone and internet access during the retreat.

81. On Monday, February 13, 2017, Plaintiff was late for his afternoon shift. Mr. Carter's EAD Final Report noted that "Brent was 'fidgety, with non-purposeful movement, pacing, muttering, pressured speech and a bit disheveled." Plaintiff, nonetheless, was present for his shift and explained his February 10, 2017, scheduling mistake to course directors. He also communicated with VUSM and explained the scheduling mistake. Plaintiff was distressed about his mistake.

82. On February 14, 2017, Plaintiff was told by VUSM to report to PCC to be evaluated by Dr. Nunn. He was told by Dr. Lomis not to return to the Community Health course as he needed to be evaluated by PCC. Plaintiff relayed to

Dr. Lomis his fear that further absences would prevent him from passing the course. Dr. Lomis assured Plaintiff that his absences would be excused and that VUSM was aware of his pending evaluations. Dr. Nunn initiated a "work-up" for depression, which included referral to Student Health to be evaluated for medical causes of depression.

83. On February 22, 2017, Plaintiff received his lab results. His Vitamin D level was extremely low, at 15ng/mL (normal range is 25-80). Vitamin D deficiency is considered a reversible cause of depression. Plaintiff was put on two months of prescription Vitamin D to correct his deficiency. By this time, VUSM had already initiated dismissal proceedings for Plaintiff despite VUSM's knowledge of Plaintiff's pending test results and his disability.

84. On February 28, 2017, the Promotions Committee met to discuss Plaintiff's progress in the program. Dr. Fleming served as Plaintiff's advocate and relayed what Plaintiff had told her as to his attendance and lack of communication. "The Committee determined that Brent's recent behavior was in violation of the multiple expectations previously outlined for him." The Promotions Committee noted that, "Prior to the meeting, EAD confirmed that Brent had not sought any official accommodation through their office." The EAD confirmed that Plaintiff had not sought any official accommodation through their office, despite the fact that Plaintiff had filed all necessary forms for official accommodations through their office and had been made aware that he would have available to him all needed

25

accommodations. The Promotions Committee dismissed Plaintiff from the program. Plaintiff immediately appealed the dismissal.

85.     On April 3, 2017, VUSM Executive Committee met to review Plaintiff's dismissal appeal. The Executive Committee voted unanimously to uphold the decision of the Promotions Committee. Mr. Carter's EAD Final Report states the event as follows:

> Brent told the Committee that he had been in a four (4) week inpatient facility in 2015, intensive attendance of AA meetings following his discharge from that facility, and progression through the 12 Step Program. Brent explained his absence from class on February 10, 2017. [He stated that he was not familiar with the online learning management system, that he thought he had Friday off, and that the miss was a mistake on his part]. Brent also reported that on the day of the miss he was at a retreat hosted by his 12 Step Program. Brent reported to the Committee that he was late on the following Monday because he was at lunch with his sponsor. Brent reported that he did not see the messages asking him to report to the Associate Dean's office until Monday evening. The committee voted unanimously to uphold the original recommendation of the PC. Brent was formally dismissed from SOM."

The Committee arrived at this decision without taking into account important evidence regarding Plaintiff's disability (i.e., Plaintiff's test results).

86.     On June 19, 2017, Plaintiff filed a formal complaint with VUSM requesting reconsideration of his dismissal on the grounds that VUSM violated Plaintiff rights as a student with a medical disability. Plaintiff also introduced pertinent medical information that was not previously considered at the Executive Committee hearing.

87.     On July 6, 2017, Dr. Miller responded to Plaintiff's complaint stating that the Executive Committee's decision was final.

26

88. On July 14, 2017, Dr. Miller responded to an inquiry by Plaintiff as to whether the Executive Committee's decision was eligible for appeal. Dr. Miller confirmed that the Executive Committee's decision was appealable through a written grievance to the Office of the Chancellor of Vanderbilt University ("Office of the Chancellor").

89. Prior to Plaintiff's submittal of his written grievance to the Office of the Chancellor, both Dr. Bonnie Miller and Dr. Amy Fleming reviewed Plaintiff's submission. Neither individual suggested edits.

90. From July 21, 2017 to July 24, 2017, Plaintiff and Dr. Fleming attempted to gather documentation for Plaintiff's appeal of his dismissal from VUSM. Dr. Fleming informed Plaintiff that the EAD had no information about him or his accommodations. Plaintiff stated in response, "I did what Scott Rodgers, Kim Lomis and Paula Nunn told me to do...I showed up to the EAD in the Baker building, had an intake, and Dr. Nunn said she mailed them the supporting documents." As mentioned in Mr. Carter's EAD Final Report, at the time of Mr. Carter's investigation, the EAD had on file a *New Student Registration* form and a *Student Disability Services Request* form from Plaintiff, both dated February 15, 2013.

91. On July 28, 2017, Plaintiff submitted his written grievance to the Office of the Chancellor.

92.     On August 1, 2017, the Office of the Chancellor received Plaintiff's grievance. The Office of the Chancellor forwarded Plaintiff's grievance to the EAD for investigation on August 9, 2017.

93.     On August 9, 2017, Plaintiff reached out to Dr. Miller to ask for guidance on how to proceed. Dr. Miller recommended that Plaintiff proceed with the investigation.

94.     On August 10, 2017, Dr. Fleming recommended through email that Plaintiff move forward with the grievance process with the Office of the Chancellor. Dr. Fleming's support, along with the support of Dr. Miller, confirmed for Plaintiff that he had the support of VUSM with his grievance and that moving forward with the investigation would be in his best interest.

95.     On August 16, 2017, Plaintiff was contacted by Mr. Michael Carter with the EAD, who was in charge of investigating Plaintiff's claim of disability discrimination.

96.     On August 22, 2017, Plaintiff met with Mr. Carter in person, and provided Mr. Carter with all of the documentation that he requested. Mr. Carter sent Plaintiff his interview notes and asked Plaintiff for comments. Plaintiff added to the document and sent back to Mr. Carter.

97.     From September 2017 to March 2018, Mr. Carter conducted his investigation into Plaintiff's grievance. It took Mr. Carter over six (6) months to complete his report, which significantly delayed the grievance process. Plaintiff

28

made multiple attempts to contact Mr. Carter, some attempts were never answered at all.

98. As per the *2017-2018 Vanderbilt University Student Handbook: Complaint and Grievance Procedures – Complaint Procedure*, the "EAD will conduct an investigation of allegations concerning prohibited discrimination (usually within ninety [90] business days) [and] will issue a finding to the appropriate University official, and will seek to resolve the matter." The Handbook continues to say, "If the EAD is unable to complete the investigation within this time period, then the EAD will contact the complainant and provide an estimate time frame for completing the investigation." The EAD investigation performed by Mr. Carter took significantly longer than 90 business days and Plaintiff had to prompt Mr. Carter for an estimated time frame, with which Mr. Carter did not comply.

99. In an email dated January 15, 2018, Mr. Carter stated to Plaintiff that he was "hoping to be done [with the report] by the end of this week (or next week at the latest)."

100. On March 9, 2018, Mr. Carter emailed his determination letter, nearly two months after his January 15, 2018 email. Mr. Carter determined that there was "no evidence of discrimination." Mr. Carter is an employee of Vanderbilt University.

101. On June 19, 2018, Lori Hemmer from the Office of the Chancellor responded to Plaintiff's earlier requests for the status of his grievance. This was three months after the date Mr. Carter submitted his final report. Plaintiff had contacted the Office of the Chancellor on the following dates through email and had

29

received no response from the Office of the Chancellor until Dr. Hemmer's June 19, 2018:

> 1. April 30, 2018 – Email to Ms. Hemmer;
>
> 2. June 11, 2018 – Email to Ms. Hemmer;
>
> 3. June 18, 2018 – Email to the Chancellor of VUSM.

102. As per the *2017-2018 Vanderbilt University Student Handbook: Complaint and Grievance Procedures – Grievance Procedure*, "Upon ascertaining that the complaint procedure has been exhausted, the Chancellor's office shall refer the [student's] grievance to the Faculty Senate Committee on Student Affairs, usually within thirty (30) days during the academic year." Plaintiff's grievance had been filed with the Chancellor's Office three (3) months before the Chancellor's Office referred his grievance to the Faculty Senate Committee on Student Affairs.

103. In her June 19, 2018 email, Ms. Hemmer states that the Chancellor was going to forward Plaintiff's grievance to the Student Life Committee of the Faculty Senate. She stated the following:

> Because the grievance is arising over the summer, the student representatives who would normally be here to join the Student Life Committee of the Faculty Senate (one undergraduate nominated by the Vanderbilt Student Government, and two professional students nominated by the governing bodies of the professional/graduate schools) are not on campus to serve. New students will be appointed in the fall. In order to hear your grievance in a more timely fashion and because of the student vacancies on the panel, the Chancellor would like to appoint three medical students, who would be present during the summer, to hear your grievance. If, in the alternative, you prefer to have your grievance held for the beginning of the school year when the new panel of students is named, we can do so.

30

Plaintiff replied that his preference would be to expedite the process. Plaintiff accepted that the Faculty Senate Committee would be of a different professional make-up (three fellow medical students instead of elected members of the entire Vanderbilt student body) so that the process may be expedited. He realized the risk of bias as the entire Faculty Senate would be comprised of individuals beholden to VUSM.

104. On September 14, 2018, the Chair of the Faculty Senate Committee, Dr. Kyla Terhune, contacted Plaintiff to inform him that they will take up consideration of his grievance and hold a hearing. This email was nearly three months after her initial June 19, 2018 email which detailed a hearing would be held over the summer.

105. On September 20, 2018, Plaintiff emailed Dr. Terhune regarding Mr. Carter's handling of his investigation, detailing all contact with Mr. Carter over the six (6) months of Mr. Carter's investigation. There is no record of anyone at VUSM looking into Plaintiff's concerns and Mr. Carter was never asked to account for the extended length of time of the investigation or his lack of contact with Plaintiff during the investigation.

106. On October 3, 2018, the Faculty Senate Committee met to hear Plaintiff's grievance. The grievance hearing took place in-person and involved only Plaintiff and the Faculty Senate Committee. The hearing lasted approximately three (3) to four (4) hours. The Faculty Senate Committee asked Plaintiff questions and called four (4) witnesses. Despite this hearing being held after new student

representatives to the Faculty Senate Committee had been elected, the Faculty Senate Committee chose to use the unelected, faculty selected group of medical students to comprise the Faculty Senate Committee hearing Plaintiff's matter.

107. The composition of the Faculty Senate greatly prejudiced Plaintiff and served no purpose, as the time for an expedited hearing during the summer had long passed. On information and belief, these medical students were swayed by the opinions of those on the Faculty Senate Committee, who held the students' medical educations and future careers in their hands.

108. On October 5, 2018, Plaintiff submitted his final comments regarding what the witnesses said at the hearing as he was not permitted to cross examine any of the witnesses. This was the only opportunity to respond to the claims of the witnesses.

109. On October 23, 2018, Plaintiff sent a text to Dr. Terhune inquiring whether a decision had been reached. Dr. Terhune responded that she would be in touch with the Office of the Chancellor to inquire about the process of informing Plaintiff of the decision. Plaintiff received no further follow up from the university.

110. On June 1, 2020, Plaintiff sent an email to the members of the Faculty Senate Committee inquiring as to why there had been an almost two-year delay in reporting the findings of their committee.

111. Vanderbilt procedures require a report to be filed within three weeks. The Faculty Senate Committee took nearly two years. The controlling Vanderbilt grievance procedural policy, the *2017-2018 Vanderbilt University Student*

32

*Handbook: Complaint and Grievance Procedures – Grievance Procedure*, is crystal

clear and requires the Committee to complete its report in three weeks. It provides

that:

> After each case, the committee shall write its report. The report should be completed within three weeks and shall include a statement of the committee's findings, the basis for those findings, and, if necessary, recommendations for any corrective action that should be taken…The report, including the vote and any dissenting statements, shall be sent to the Chancellor within one week after completion…The Chancellor shall communicate his decision to the committee…The Office of the Chancellor shall then notify the student and the other affected persons, in writing, of the final decision, usually within thirty (30) days of receipt of the Committee's report, during the academic year.

112.    On June 5, 2020, Plaintiff had still not heard from the Office of the

Chancellor. Plaintiff emailed the Faculty Senate Committee stating that he would

be coming to campus in person the following week.

113.    On June 5, 2020 at 2:05 p.m., Plaintiff received a memo from Susan

Wente, Interim Chancellor of Vanderbilt University, stating that Plaintiff's

dismissal would be upheld and that the grievance process had concluded.

## COUNT I
## Violations of Title III of the American with Disabilities Act

114.    Plaintiff refers to and incorporates each of the foregoing paragraphs as

if fully stated herein.

115.    Title III of the American with Disabilities Act of 1990 ("ADA"), 42

U.S.C. §12101 *et seq.*, is a civil rights law that prohibits discrimination based on

disability.

116.    Pursuant to 42 U.S.C. § 12182(a), Defendants cannot discriminate against Plaintiff "on the basis of disability."

117.    Defendants are private entities under the ADA, 42 U.S.C. § 12181 (7)(J) and is subject to Title II of the ADA.

118.    The ADA bars educational discrimination against "qualified individuals with disabilities."  The ADA prohibits Defendants from discriminating against persons with disabilities.  42 U.S.C. § 12182.

119.    Title II of the ADA applies specifically to educational institutions, including Defendants, and requires them to make educational opportunities, extracurricular activities, and facilities open and accessible to all students.

120.    Pursuant to 42 U.S.C. § 12182(b)(2)(A)(ii), discrimination includes failing to make "reasonable modifications in policies, practices, or procedures" to accommodate Plaintiff, unless the modifications would "fundamentally alter the nature" of the course requirements.

121.    Plaintiff is a person with a disability. 42 U.S.C. § 12102.  He suffers from a mental impairment or impairments that substantially limit one or more major life activities or he has a record of such an impairment or is regarded as having an impairment or disability. 42 U.S.C. § 12102.  Thus, he is a qualified individual with a disability.

122.    Plaintiff suffers from Major Depressive Disorder which is a specific learning disability that affects his ability to concentrate and causes him to be

34

distracted. His depressive disorder negatively and substantially affected his ability to perform adequately at VUSM.

123. Despite making repeated requests for guidance, remediation, and accommodations, Defendants violated the ADA by failing to grant Plaintiff's accommodations and mishandling his accommodations paperwork and requests. The ADA likewise requires Defendants to offer reasonable accommodations to Plaintiff.

124. Defendants not only failed to accommodate Plaintiff but failed to have an adequate program in place for students with Plaintiff's disability. In sum and substance, Defendants have run afoul of the ADA.

125. As a result of Defendants' violations of the ADA, Plaintiff:

    a.    has suffered substantial harm due to his disability in the form of negative clinical evaluations that escalated to dismissal from the VUSM program.

    b.    has suffered substantial harm regarding –

        (i) the reality that he cannot become a medical professional due to the dismissal;

        (ii) incurring significant monetary (due to school debt incurred and loss of anticipated salary as a medical professional) and emotional damages as a result of Defendants' violations.

126. The ADA has no exemption from the statutes' reach for Defendants.

127. Federal disability laws provide for substantial relief, including injunctions, monetary damages, and payment of attorney's fees to the prevailing party.

## COUNT II
## Violation of Section 504 of the Rehabilitation Act of 1973

128.  Plaintiff refers to and incorporates each of the foregoing paragraphs as if fully restated herein.

129.  Like the ADA, Section 504 of the Rehabilitation Act prohibits a federally funded program from discrimination against an "otherwise qualified individual with a disability" because of his disability.

130.  Pursuant to 29 U.S.C. § 794(a), Plaintiff is an "otherwise qualified individual with a disability." Like the ADA, Section 504 carries its own remedies.

131.  There is a direct causal link between Defendants' failure to advise Plaintiff adequately and grant Plaintiff necessary accommodations and the difficulties Plaintiff experienced in his coursework and clinical rotations. The Defendants violated Section 504 of the Rehabilitation Act of 1973.

## COUNT III
## Breach of Contract Implied and Express

132.  Plaintiff refers to and incorporates each of the foregoing paragraphs as if fully restated herein.

133.  Plaintiff's relationship with Defendants is contractual in nature, both express and implied.

134.  Pursuant to Plaintiff's contract with Defendants, Defendants agreed, among other things:

> a.  to provide Plaintiff with academic instruction and training leading to becoming a medical professional;

36

        b.     to consider his requests for accommodations and hear grievances pursuant to federal law in a timely manner;

        c.     to follow the provisions of the Vanderbilt University Student Handbook and student policies in a fundamentally fair manner; and

        d.     to treat Plaintiff with fundamental fairness and equity without penalty or bias because of his disability.

135.    As consideration for the contract, Plaintiff paid money to Defendants as tuition.

136.    Defendants breached their contractual commitment to Plaintiff:

        a.     by failing to provide him with accurate advice about accommodations available to him;

        b.     by failing to provide him with timely accommodations for course work and clinical rotations as required by the ADA; and

        c.     by requiring him to complete additional assignments along with the work required in his course remediation. No other students in the course had to complete this additional work.

137.    Defendants also breached their contractual commitment to Plaintiff:

        a.     by ineffectively investigating the substance of the evaluations that formed the basis for his dismissal;

        b.     by failing to provide an unbiased and neutral panel to sit on the Promotions Committee, Executive Committee, and Faculty Senate Committee;

        c.     by having an untimely appeals process that clearly failed to address the appeal issues raised by Plaintiff.

138.    Plaintiff relied, to his detriment, on Defendants' promise of fundamentally fair Promotions Committee, Executive Committee, and Faculty Senate Committee hearings.

139.   As a result of Defendants' breach of contract, Plaintiff:

   a.   has suffered substantial harm, including irreparable harm to his professional reputation and detriment to future educational and employment opportunities; and

   b.   has also incurred significant monetary and emotional damages as a result of VUSM's breach of contract.

## COUNT IV
## Breach of Implied Covenant of Good Faith and Fair Dealing

140.   Plaintiff refers to and incorporates each of the foregoing paragraphs as if fully restated herein.

141.   Defendants did not deal fairly, equitably, and in good faith with Plaintiff.

142.   Plaintiff has suffered harm as a result of Defendants' violations of their obligations under the implied covenant of good faith and fair dealing/obligation of good faith performance.

143.   As a result of Defendants' breach of covenants of good faith and fair dealing, Plaintiff:

   a.   has suffered substantial harm, including irreparable harm in the form of destruction of his professional reputation, career as a medical professional, and employment opportunities; and

   b.   has also incurred significant monetary damages as a result of Defendants' breach of the covenant.

## COUNT V
## Negligent Misrepresentation

144.   Plaintiff refers to and incorporates each of the foregoing paragraphs as if fully restated herein.

38

145.    Defendants were acting in the course of their enterprise by offering a medical degree program and education to Plaintiff.

146.    Defendants negligently supplied false and misleading information regarding VUSM to Plaintiff in failing to exercise reasonable care or competence in communicating information about VUSM's medical program, its accommodations, its faculty, the Plaintiff's options for remediation and withdraw, and VUSM's ability to assist and support Plaintiff in completing his required coursework, clinical work, and exams.

147.    Plaintiff relied upon the various representations and he would not have continued into further transactions with VUSM without the various representations.

148.    Plaintiff justifiably relied upon VUSM and Defendant Vanderbilt University officials. Further, Plaintiff acted as a reasonable person, in the light of the circumstances and his disability, to accept the Defendants' representations regarding VUSM's medical program and patient treatment program. The Defendants committed the tort of negligent misrepresentation.

### COUNT VI
### <u>Negligent Infliction of Emotion Distress</u>

149.    Plaintiff refers to and incorporates each of the foregoing paragraphs as if fully restated herein.

150.    Defendants had a duty to the Plaintiff when it assumed primary care of his Major Depressive Disorder during the course of his term as a medical student of VUSM.

151.    Defendants breached their duty of care when they failed to inform the Plaintiff of all disability options available to him as a student with a registered disability under VUSM's medical degree program.

152.    Due to Defendants' failure to properly inform and accommodate Plaintiff during the course of his study with VUSM, Plaintiff incurred both injury and loss. Defendants' failure to properly inform and accommodate Plaintiff is both the actual and proximate cause of Plaintiff's severe emotional and financial injury.

153.    Had Plaintiff been adequately counseled, informed, and treated both medically and procedurally by Defendants, his injury would not have occurred.

154.    As Plaintiff's injury was both a result of, and exacerbated by, the Defendants' misrepresentations, on which the Plaintiff detrimentally relied, the Plaintiff has:

> a.  suffered substantial harm, including irreparable harm in the form of destruction of his professional reputation, career as a medical professional, and employment opportunities; and

> b. incurred significant monetary damages as a result of Defendants' negligence.

155.    The Defendants committed the tort of negligent infliction of emotional distress.

## INJUNCTIVE RELIEF

156.    Plaintiff requests that the Court enter a permanent injunction after a trial on the merits.

157.    Plaintiff has met all the requirements for this Court to enter a permanent injunction ordering Defendants to readmit him into their VUSM

40

program, to take all actions necessary for him to graduate and become a licensed physician, and be able to enter residency programs, and do all other things necessary regarding his medical education, residency, and to have other related opportunities.

## JURY DEMAND

158.   Plaintiff demands a trial by jury of his peers for all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays for the following relief:

1.   For process to issue and that the Defendants be served;

2.   To find Defendants liable for each of the Causes of Action discussed above;

3.   For the Court to issue a permanent injunction after a trial on the merits, ordering the Defendants:

   a.   to reverse the dismissal and readmit Plaintiff into the VUSM program;

   b.   to follow the requirements of federal disability law for Plaintiff;

   c.   to take all actions necessary for Plaintiff to graduate and become a licensed physician, and be able to enter residency programs, and do all other things necessary regarding his medical education, residency, and to have other related opportunities.

4.   For the jury or the Court to award compensatory damages of Three Million Dollars ($3,000,000.00) to Plaintiff for the costs, including tuition, fees and

41

other related costs, associated with Plaintiff's attendance at VUSM; Defendants'
damage to his professional reputation and detriment to Plaintiff's future
employment opportunities; Plaintiff's lost wages as a medical professional; and the
emotional damages directly and proximately caused by Defendants' actions;

5.    For an order directing Defendants to pay reasonable attorneys' fees
and costs incurred by Plaintiff;

6.    For a jury to hear and decide all issues that a jury may hear and
decide;

7.    For the Court to expedite the case on its docket; and

8.    For other relief as the law and justice permit and the Court deems
appropriate to vindicate Plaintiff's rights.

Dated this 4th day of June, 2021.

Respectfully submitted,

/s/Perry A. Craft
Perry A. Craft, BPR # 006056
LAW OFFICE OF PERRY A. CRAFT, PLLC
402 BNA Drive, Building 100, Suite 202
Nashville, Tennessee 37217
Telephone (615) 953-3808
Facsimile: (615) 739-6292
Email:  perrycraft@craftlegal.com

42