IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| BRENT EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 3:21-cv-00439 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| VANDERBILT UNIVERSITY SCHOOL | ) | |
| OF MEDICINE and VANDERBILT | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION

Pending before the Court is Defendants' Motion to Dismiss (Doc. No. 31, "Motion"), supported by a Memorandum of Law (Doc. No. 32, "Memorandum of Law"). Plaintiff filed a response in opposition to the Motion, (Doc. No. 37, "Response"), and Defendants replied (Doc. No. 38, "Reply"). For the following reasons, the Motion will be GRANTED.

## BACKGROUND[1]

In 2001, Plaintiff received a diagnosis of Major Depressive Disorder. (Doc. No. 22 at ¶ 8). Plaintiff began attending Vanderbilt University Medical School in 2009. (*Id*. at ¶¶ 10, 12). While in medical school, Plaintiff received treatment at Vanderbilt's Psychological and Counseling Center for his depression. (*Id*. at ¶ 12). He repeatedly met with Dr. Scott Rodgers, Dean of Students at VUSM, to discuss the treatment he was receiving for his depression. (*Id*. at ¶ 17).

---

[1] In Plaintiff's Complaint he references a singular "Defendant," likely because he alleged in the Complaint that Vanderbilt University School of Medicine "is not an independent entity, but a part of Vanderbilt University." (Doc. No. 22 at ¶ 6). Throughout this opinion the Court will refer to Defendants in the plural. The Court notes this to dispel any confusion when citing Plaintiff's Complaint that refers to "Defendant" in the singular.

In November 2012, Plaintiff suffered a severe relapse of his Major Depressive Disorder. (*Id*. at ¶ 19). From 2009 until 2012, Plaintiff's academic performance was excellent. (*Id*. at ¶ 16). After his relapse in November 2012, however, Plaintiff's academic performance began to suffer. (*Id*. at ¶ 20). His depression caused him to miss multiple shifts and activities necessary for credit towards his medical degree. (*Id*.). Despite being aware of Plaintiff's depression, VUSM was extremely critical of his performance during an Emergency Medicine clinical. (*Id*. at ¶ 21). Plaintiff tried to remediate the Emergency Medicine clinical between December 2012 and January 2013, but remediation, which included added coursework required of him to "make up" for his absences, was difficult to complete due to his depression. (*Id*. at ¶ 22).

Plaintiff's anxiety and depression thereafter increased. (*Id*. at ¶ 25). He sought the counsel of Dr. Rodgers through in-person meetings between November 23, 2012, and December 16, 2012. (*Id*.). Plaintiff inquired as to how he should approach remediating the Emergency Medicine clinical, and how to best manage his severe depression and increased coursework. (*Id*.). Dr. Rodgers informed Plaintiff that he would need to "fix the problem" himself or he would not graduate from VUSM. (*Id*.). Dr. Rodgers failed to inform him that students had the option to withdraw from a course at any point *prior* to receiving a final grade. (*Id*. at ¶ 26). Plaintiff received a failing grade in the Emergency Medicine clinical. (*Id*.).

On December 17, 2012, VUSM's Promotions Committee placed Plaintiff on academic probation due to his failing grade in the Emergency Medicine clinical. (*Id*. at ¶ 30). The Promotions Committee informed Plaintiff that his probation would last until he had successfully completed the requirements for the Emergency Medicine clinical. (*Id*. at ¶ 31). Plaintiff continued to attempt to remediate the course by making up shifts throughout January 2013, but was unable to successfully do so because of symptoms related to his depression. (*Id*. at ¶¶ 22, 34). VUSM did

not offer Plaintiff any accommodations or special consideration despite knowledge of his severe depression. (*Id*. at ¶ 34). On February 6, 2013, Plaintiff received a passing grade of 72% for the Emergency Medicine clinical. (*Id*. at ¶ 42).

On February 11, 2013, Dr. Kim Lomis[2] sent an email to Plaintiff stating that she was aware that Plaintiff did not attend his Primary Care clerkship. (*Id*. at ¶ 44). The next day, Plaintiff met with Dr. Lomis and reported to her that he had been seen at Vanderbilt's Psychological and Counseling Center for depression, and that his doctor (Dr. Nunn) would send a letter to Vanderbilt's Equal Opportunity, Affirmative Action, and Disability Services Office ("EAD") regarding recommended accommodations later that day. (*Id*. at ¶ 45). On February 14, 2013, Dr. Nunn submitted medical documentation of Plaintiff's depression to the EAD. (*Id*. at ¶ 46). On February 15, 2013, the EAD informed Plaintiff that the accommodations requested by Dr. Nunn would be made available to him. (*Id*. at ¶¶ 46, 49). On March 25, 2013, the Promotions Committee granted Plaintiff a medical leave of absence until March 2014 to treat his depression. (*Id*. at ¶ 57). Plaintiff then commenced a medical leave of absence for the 2013-2014 academic year. (*Id*. at ¶ 59).

In September 2014, Plaintiff returned to VUSM and enrolled in a Child and Adolescent Psychiatric clerkship but did not perform well in the clerkship. (*Id*. at ¶ 62). In October 2014, Plaintiff decided to return to his medical leave of absence out of an abundance of caution to his education and his patients. (*Id*. at ¶ 64). Plaintiff spoke with Dr. Bonnie Miller, Senior Associate Dean for VUSM, extensively about his need to return to his medical leave of absence. (*Id*. at ¶¶ 64-65). Plaintiff did not realize that those conversations did not amount to a formal request for a medical leave of absence. (*Id*.). On February 12, 2015, the Promotions Committee voted

---

[2] The Complaint does not indicate Dr. Lomis's position at VUSM.

unanimously to dismiss Plaintiff from VUSM. (*Id.* at ¶ 70). On April 22, 2015, Plaintiff appeared before the Executive Board to appeal his dismissal from VUSM. (*Id.* at ¶ 72). That same day the Executive Board overturned Plaintiff's dismissal and recommended that Plaintiff be placed on a medical leave of absence. (*Id.* at ¶ 73).

In July of 2016, Plaintiff returned to full time coursework and successfully completed five courses. (*Id.* at ¶¶ 75, 76). In February 2017, Plaintiff enrolled in a Community Health course, and immediately began having attendance issues. (*Id.* at ¶¶ 78-81). On February 28, 2017, the Promotions Committee dismissed Plaintiff from VUSM, and Plaintiff immediately appealed his dismissal. (*Id.* at ¶ 83). On April 3, 2017, the Executive Board upheld Plaintiff's dismissal. (*Id.* at ¶ 84). On July 28, 2017, Plaintiff submitted a written grievance to the Office of the Chancellor, requesting reconsideration of his dismissal on the grounds that VUSM violated Plaintiff's rights as a student with a medical disability. (*Id.* at ¶ 90). The Office of the Chancellor forwarded Plaintiff's grievance to the EAD for investigation on August 9, 2017. (*Id.* at ¶ 91). From September 2017 to March 2018, the EAD investigated Plaintiff's claim of disability discrimination. (*Id.* at ¶ 96). The six months it took to complete the investigation significantly delayed Plaintiff's grievance process. (*Id.*).

As per the *2017-2018 Vanderbilt University Student Handbook: Complaint and Grievance Procedures – Complaint Procedure*, the "EAD will conduct an investigation of allegations concerning prohibited discrimination (usually within ninety [90] business days) [and] will issue a finding to the appropriate University official, and will seek to resolve the matter." The Handbook continues to say, "If the EAD is unable to complete the investigation within this time period, then the EAD will contact the complainant and provide an estimate time frame for completing the

investigation." (*Id.* at ¶ 97). The EAD's investigation took significantly longer than 90 business days. (*Id.*).

On March 9, 2018, the EAD reported to the Chancellor's Office that its investigation found no evidence of discrimination. (*Id.* at ¶ 99). On June 19, 2018, the Chancellor's Office referred Plaintiff's grievance to the Faculty Senate Committee. (*Id.* at ¶ 102). The *2017-2018 Vanderbilt University Student Handbook: Complaint and Grievance Procedures – Grievance Procedure*, provides that "Upon ascertaining that the complaint procedure has been exhausted, the Chancellor's office shall refer the [student's] grievance to the Faculty Senate Committee on Student Affairs, usually within thirty (30) days during the academic year." (*Id.* at ¶ 101). Plaintiff's grievance had been filed with the Chancellor's Office three (3) months before the Chancellor's Office referred his grievance to the Faculty Senate Committee on Student Affairs. (*Id.*).

On October 3, 2018, the Faculty Senate Committee held a three-to-four-hour hearing on Plaintiff's grievance. (*Id.* at ¶ 105). On June 5, 2020, the Faculty Senate Committee reported that Plaintiff's dismissal would be upheld and that the grievance process had concluded. (*Id.* at ¶ 112). The Faculty Senate Committee took nearly two years to report its decision. (*Id.* at ¶ 110). The *2017-2018 Vanderbilt University Student Handbook: Complaint and Grievance Procedures – Grievance Procedure*, requires the Committee to complete its report in three weeks from the conclusion of the hearing,[3] as it provides:

> After each case, the committee shall write its report. The report should be completed within three weeks and shall include a statement of the committee's findings, the basis for those findings, and, if necessary, recommendations for any corrective action that should be taken…The report, including the vote and any dissenting statements, shall be sent to the Chancellor within one week after completion…The Chancellor shall communicate his decision to the

---

[3] The Handbook language is not completely clear as what event triggers the requirement that the committee complete the report "within three weeks." However, from the context, it appears that the Handbook requires the report to be issued within three weeks of the hearing on a student's grievance, as the paragraph immediately preceding the quoted one discusses the hearing process. (*See* Doc. No. 15-4 at 7).

committee…The Office of the Chancellor shall then notify the student and the other affected persons, in writing, of the final decision, usually within thirty (30) days of receipt of the Committee's report, during the academic year.

(*Id.*).

On June 4, 2021, Plaintiff filed his Complaint in this Court against Defendants Vanderbilt University and Vanderbilt University Medical School. (Doc. No. 1). Plaintiff asserts seven counts against Defendants: "Violations of the Americans with Disabilities Amendment Act of 2008" (failure to accommodate and disability discrimination) (Count I); "Violation of Section 504 of the Rehabilitation Act of 1973" ("Count II"); "Breach of Contract Implied and Express" (Count III); "Breach of Implied Covenant of Good Faith and Fair Dealings" (Count IV); "Promissory Estoppel" (Count V); "Negligent Misrepresentation" (Count VI); and "Negligent Infliction of Emotion [sic] Distress" (Count VII). (*Id.*). On July 26, 2021, Plaintiff filed a First Amended Complaint, asserting the same causes of action. (Doc. No. 22). Defendants filed the instant Motion, seeking dismissal of all of Plaintiff's claims. (Doc. No. 31). Plaintiff filed a response in opposition to the Motion, (Doc. No. 37), and Defendants replied (Doc. No. 38). Thus, the Motion is ripe for adjudication.

## LEGAL STANDARD

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true as the Court has done above. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6ᵗʰ Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations – factual allegations, *i.e.*, allegations of factual matter – plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary

judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

## DISCUSSION

In his Complaint, Plaintiff asserts two federal, and five state-law, causes of action.[4] Via the Motion and Memorandum of Law, Defendants argue that Plaintiff's federal claims should be dismissed because those claims are time-barred. Defendants additionally argue that Plaintiff's five state law claims should be dismissed, because each of those five claims fail to state a claim upon which relief can be granted. The Court will explore Defendants' arguments in turn.

---

[4] As noted below, one of these causes of action (the one based on an alleged breach of the implied covenant of good faith and fair dealing) is not in fact a cognizable *cause of action* at all.

## I. Plaintiff's Federal Claims are Time-Barred[5]

Defendants argue that Plaintiff's federal claims are barred by the applicable statute of limitations. (Doc. No. 32 at 5-15). Defendants argue that a one-year limitations period applies to Plaintiff's federal claims (as opposed to the four-year limitations period that applies to claims that arise under the Americans with Disabilities Act Amendments Act of 2008). Defendants further argue that Plaintiff's federal claims accrued when he "[knew] or [had] reason to know of the injury, which is the basis of his action" and that "[a] plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." (Doc. No. 32 at 11 (citing *Sevier v. Turner*, 742 F.2d 262, 272-73 (6th Cir. 1984))). Thus, Defendants argue that Plaintiff's federal claims accrued on April 3, 2017 (at the latest),[6] the date he alleges that he was terminated from VUSM. And because he did not file his Complaint until June 4, 2021, over four years later, Defendants argue that Plaintiff's federal claims are time-barred. (*Id.*).

---

[5] The undersigned will highlight a few important points regarding the terminology used herein, by reference to something he wrote years ago:

> On the subject of limitations, courts often use language loosely, interchanging various terms for one another. For maximum clarity, terms must be defined so that important concepts are distinguishable from one another, then used consistently in accordance with those definitions. Herein, legal authorities will be paraphrased in terms of the following definitions to convey the concepts expressed therein, regardless of the terms used (or misused) by the authority being cited.

> As used herein, a "statute of limitations" refers to a legislative enactment, or codification thereof, that sets forth a limitations period.... A "limitations period" refers to the length of time-the specific number of days, months, or years-in which a given claim can be commenced, as set forth in a statute of limitations. "Limitations" [refers] to the legal doctrine whereby a plaintiff is barred from bringing a claim based upon the lapse of the applicable limitations period.

Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1017–19 (1997). When using his own words, the undersigned intends to stick generally to this terminology, with the caveat that the case law and briefing of the parties he quotes may not do so and thus may be less precise or looser in their terminology.

[6] Defendants assert that Plaintiff alleges that on February 28, 2017, the Promotion Committee dismissed Plaintiff from the medical school. (Doc. No. 22 at ¶ 83). He states that on April 3, 2017, the VUSM Executive Committee voted unanimously to uphold the decision of the Promotion Committee. (*Id.* at ¶ 84). Thus, according to Defendants, "taking the facts as Plaintiff pleads them, he was dismissed from VUSM at the latest on April 3, 2017." (Doc. No. 32 at 6 n.2).

In the Response, Plaintiff argues that his federal claims are not barred by the statute of limitations, because "Defendants' violations are continuing violations[,] the statutes of limitations are equitably tolled and Defendants are equitably estopped from asserting them." (Doc. No. 37 at 8). Plaintiff further argues that his claims did not accrue until he exhausted his administrative remedies with VUSM, and the Faculty Senate Committee did not issue a final decision on Plaintiff's appeal until June 5, 2020. (*Id.* at 14 (citing Doc. No. 22 at ¶ 112)). Thus, Plaintiff maintains that his Complaint filed on June 4, 2021 is timely filed.

A. *Statute-of-Limitations Arguments and Motions to Dismiss*

"Rule 12(b)(6), which considers only the allegations in the complaint, is generally not an appropriate vehicle for dismissing a claim based upon the statute of limitations[.] [However, if] the allegations in the complaint affirmatively show that the claim is time-barred, dismissing the claim under Rule 12(b)(6) is appropriate." *Cheatom v. Quicken Loans*, 587 F. App'x 276, 279 (6th Cir. 2014) (affirming 12(b)(6) dismissal on statute of limitations grounds).

B. *Which SOL applies to Plaintiff's Federal Claims*?

The first question a court must usually answer when conducting a statute-of-limitations analysis is which statute of limitations applies to the plaintiff's claims. *See* Richardson, *supra* n. 3, at 1025. And so it is in this case.

As noted, the parties dispute whether Plaintiff's federal claims are subject to a statute prescribing a one-year limitations period or, instead, a statute prescribing a four-year limitations. Many federal statutes (such as the ADA and Rehabilitation Act) do not contain a specific statute of limitations. Where a federal statute provides a cause of action but does not specify a limitations period, courts determine the appropriate statute of limitations in one of two ways. First, if the federal cause of action arises under an Act of Congress enacted *after* December 1, 1990, it is

governed by 28 U.S.C. § 1658, which prescribes a four-year statute of limitations period. *Jones v. R.R. Donnelley & Sons Co*., 541 U.S. 369, 382 (2004). Alternatively, if the federal cause of action arises under an Act of Congress enacted *before* December 1, 1990, courts borrow the most analogous state limitations period, so long as the application of state law is not "at odds with the purpose or operation of federal substantive law." *North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) (internal quotation marks and citations omitted). Further, "[i]f an amendment to an existing law is the reason a plaintiff can sue (in other words, makes the suit possible), then the suit arises under that amendment. But if the plaintiff could have sued under that law before the amendment, then the suit arises under the original statute." *Tomei v. Parkwest Med. Ctr*., 24 F. 4th 508, 512 (6th Cir. 2022). In the context of the ADA, this former concept is significant, because the ADA was enacted in July of 1990, while the amendments to the ADA (the ADAAA) became effective in 2008. Thus, a one-year limitations period (borrowed from Tennessee law) applies to causes of action arising under the ADA and filed in Tennessee, *Collier v. Austin Peay State University*, 616 F. Supp. 2d 716, 771 (M.D. Tenn. 2009)), while a four-year limitations period applies to causes of action arising under the ADAAA.

 The Court need not decide whether Plaintiff's disability discrimination claims arise under the ADA or the ADAAA (*i.e*., whether a one-year or four-year limitations period applies), because, as discussed below, Plaintiff's claim is untimely under an application of either a one-year limitations period, or a four-year limitations period.[7]

---

[7] Count II (Violations of the Rehabilitation Act of *1973* (emphasis added)) was obviously enacted prior to 1990, and therefore, a one-year statute of limitations applies to this claim. This observation is not made by either party, each of which instead focuses its argument on whether both of Plaintiff's federal claims (Counts I and II) arise under the amendments to the ADA. "In general, a 'suit arises under the law that creates the cause of action.'" *Tomei*, 24 F.4th at 511. (quoting *Am. Well. Works Co. v. Layne & Bowler Co.,* 241 U.S. 257, 260 (1916)). But Count II is a claim that clearly arises under the Rehabilitation Act of 1973. *See id.* (explaining that a claim arises under the statute in which the plaintiff brings his cause of action and affirming the district court's holding that the plaintiff's claim arose under the Rehabilitation Act, and not the Affordable Care Act).

C. *When did Plaintiff's Federal Claims Accrue?*

As noted above, Defendants argue that that Plaintiff's federal claims accrued, and thus the limitations period began to run, on April 3, 2017 (at the latest), the date he alleges that he was terminated from VUSM. And because he did not file his Complaint until June 4, 2021, over four years later, Defendants argue that Plaintiff's claims are time-barred "[r]egardless of whether Plaintiff's disability claim was actionable under the pre-amend[ment] ADA." (Doc. No. 38 at 1, Doc. No. 32 at 11).

Plaintiff argues that his claims did not accrue until he exhausted his administrative remedies with VUSM, which (according to Plaintiff) did not occur until the Faculty Senate Committee issued a final decision on Plaintiff's appeal on June 5, 2020. (Doc. No. 27 at 14 (citing Doc. No. 37, at ¶ 112))."A limitations period generally begins to run from the time the cause of action 'accrued.'" *Richardson*, supra note 4, at 1036. Yet, "the date of accrual is not necessarily synonymous with the date that the limitations period begins to run; the limitations period begins to run from the date of accrual only to the extent that applicable law says so." *Id*. "As it turns out, applicable law usually does say so; by judicial decision, by a general statute relating to the running of limitations periods, or by language in the particular statute of limitations itself, a statute's limitations period usually runs from the date of accrual." *Id*. at 1036-37. Here, the Court has no doubt that the rule is that the limitations period generally begins to run from the date of accrual,[8]

---

[8] An exception to this general rule applies in the event of one of the two circumstances that are referred to as "tolling." As the undersigned previously has noted:

> [t]he term "tolling" is used two different ways. First, "tolling" often refers to a postponement of the date the statute begins to run, usually the accrual date. By contrast, some courts use the term "tolling" to refer to suspending the running of the limitations period after it already has begun to run. Some tolling provisions cannot be placed comfortably in either tolling category, and some tolling provisions can either postpone the starting of the clock or stop it after it begins running, depending upon the timing of the event that triggers the tolling. Nevertheless, the distinction exists and is analytically important.

and thus for purposes of the general rule treats the date of accrual as synonymous with the date of the beginning of the running of the limitations period, consistent with how federal courts so often essentially equate the two dates. *See*, *e.g.*, *D.S.S. by & through McDowell v. Prudential Ins. Co. of Am.*, No. 21-5315, 2022 WL 95165, at *4 (6th Cir. Jan. 10, 2022) ("[On December 31, 2014, the cause of action accrued . . . and the [one-year] limitations period began to run. Thus, the district court did not err in determining that the cause of action accrued on December 31, 2014, and that the limitations period ran one year after that date."); *Bishop v. Children's Ctr. For Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010) (noting that while for some statutes the statute of limitations "are borrowed from state law, the actions accrue and the statutory period begins to run according to federal law").

Whether the statute of limitations is borrowed from state law (as is it for claims under the ADA and Rehabilitation Act), or prescribed by federal law (as is done with the ADAAA), federal law governs the question of when the limitations period of a federal claim accrues. *See Bishop*, 618 F.3d at 536; *Frank v. Univ. of Toledo*, 621 F. Supp. 2d 475, 483 ("Federal law governs the determination of accrual." (citing *Sevier*, 742 F.2d at 272-73)). "For claims arising under [] the ADA, [ADAAA,] and the Rehabilitation Act, that accrual occurs when the plaintiff knows or has reason to know of an injury that gives rise to the subject action." *J.H. v. Ohio Dep't of Job & Fam. Servs.*, No. 2:21-CV-206, 2021 WL 5240231, at *2 (S.D. Ohio Sept. 14, 2021) (citing *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984), and *J. Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 296 (6th Cir. 2019) (quoting *Sevier*, 742 F.2d at 272, as providing the appropriate standard for the accrual of ADA and Rehabilitation Act claims)). "Even when administrative appeals are pursued,

---

Richardson, *supra* note 4, at 1039-40. To the extent that the latter kind of "tolling occurs," then the limitations period does not begin running as of the date of accrual as it does under the general rule.

the appropriate accrual date after a discriminatory action is the date of the initial injurious decision." *Id*.

In *Printup v. Director, Ohio Department of Job and Family Services*, the plaintiff brought a § 1983 claim alleging that her employer violated her procedural and substantive due process rights when it terminated her after it discovered that she was listed on Ohio's Central Registry on Child Abuse and Neglect. 654 F. App'x 781, 783 (6th Cir. 2016). The plaintiff requested an administrative hearing, and her placement on the registry was upheld. *Id*. The administrative decision was appealed to state court and overturned. *Id*. The Sixth Circuit held that the plaintiff's claim accrued when she became aware of "her alleged deprivation of procedural due process" *i.e.*, "when she was terminated from [her job] as a result of her child-abuser designation, for this event would have alerted a typical layperson to protect her rights." *Id*. at 787–88. Furthermore, the court explained that the plaintiff's awareness of her injury was evidenced by seeking an administrative hearing to challenge her designation. *Id*.; *see also Hillspring Health Care Ctr., LLC v. Dungey*, No. 1:17-CV-35, 2018 WL 287954, at *11 (S.D. Ohio Jan. 4, 2018) (finding the accrual date was the date of the initial denial of Medicaid benefits, irrespective of the appeals that had taken place, for plaintiff's ADA, § 1983, and Rehabilitation Act claims).

Thus, a cause of action alleging discrimination accrues when a plaintiff has notice of the discrete act of alleged discrimination that allegedly occurred. *Janikowski v. Bendix Corp*., 823 F.2d 945, 947 (6th Cir. 1987); *see also Repp v. Oregon Health Scis. Univ*., 972 F. Supp. 546, 548 (D. Or. 1997) ("The alleged discriminatory act occurred when plaintiff was dismissed from school in 1993, not when his appeal was denied in 1995. . . . It is the discriminatory act that commenced the running of the statute of limitations[.]"); *Soignier v. American Board of Plastic Surgery*, 92 F.3d

547 (7th Cir. 1996) (statute of limitations on ADA claim was not tolled during surgeon's internal appeal).

The Court agrees with Defendants that it is ascertainable from the face of Plaintiff's Amended Complaint that Plaintiff's federal claims accrued at the very latest on April 3, 2017, the date he alleges that he was dismissed from VUSM, and the date he had reason to know of his injuries (*i.e.*, his dismissal from VUSM from VUSM). (*See* Doc. No. 22 at ¶ 84). Because Plaintiff did not file his Complaint until June 4, 2021, over four years later, "the allegations in the complaint affirmatively show that [Plaintiff's federal claims are] time-barred" and, therefore, "dismissing the claim under Rule 12(b)(6) is appropriate." *Cheatom*, 587 F. App'x at 279.

D. *Continuing Violations Doctrine*

In an effort to avoid the application of limitations, Plaintiff argues that the continuing violations doctrine should apply to toll the limitations period. Tolling, in the sense that Plaintiff invokes it, "refers to a postponement of the date the [limitations period] begins to run, usually the accrual date." Richardson, *supra* n.3 at 1039. Plaintiff asserts that "Defendants' actions with Plaintiff are related and are attached to other actions Defendants took with Plaintiff within the statute of limitations period." (Doc. No. 37 at 15). Specifically, Plaintiff argues that "Defendants' past discriminatory conduct outside of the statute of limitations period sufficiently relates to Defendants' conduct occurring within the limitations period, which is the Faculty Senate Committee's Final Decision." (*Id.*). In his Amended Complaint, Plaintiff includes a section titled "Continuing Violations Doctrine," in which he both asserts that the continuing violations doctrine applies and includes the factual basis that he suggests supports that assertion. (*See* Doc. No. 22 at ¶¶ 173-178). Defendants argue that their "alleged failure to accommodate is a discrete act—not an ongoing violation or pattern of discrimination—regardless of whether Plaintiff argues that he

suffered a continuing impact from that alleged failure." (*Id.*). Therefore, Defendants argue that the continuing violations doctrine does not apply here.

The Sixth Circuit recognizes that the "continuing violation doctrine" may operate to toll the statute of limitations

> The "continuing violation" doctrine provides that when "there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." *Haithcock v. Frank*, 958 F.2d 671, 677 (6th Cir.1992). In other words, when a continuing violation is shown, "a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 408 (6th Cir.1999); *see also Held v. Gulf Oil Co.*, 684 F.2d 427, 430 (6th Cir.1982). This Court has held that continuing violations may be shown in one of two ways. The first is "where there is some evidence of present discriminatory activity giving rise to a claim of a continuing violation," and "at least one of the forbidden discriminatory acts [has] occurred within the relevant limitations period." *Haithcock*, 958 F.2d at 678 (citation omitted) (emphasis in original). The second type of continuing violation exists when a plaintiff has demonstrated a longstanding and over-arching policy of discrimination. *See id*. This requires a showing by a preponderance of the evidence "that some form of intentional discrimination against the class of which plaintiff was a member was the company's 'standing operating procedure.'" *EEOC v. Penton Indus. Publ'g Co.*, 851 F.2d 835, 838 (6th Cir.1988) (citation omitted).

*Kovacevich v. Kent State Univ.*, 224 F.3d 806, 829 (6th Cir. 2000); *Seay v. Fortune Plastics, Inc.*, No. 3:09-CV-0605, 2012 WL 610006, at *3 (M.D. Tenn. Feb. 24, 2012).

However, the Sixth Circuit has held, in the aftermath of *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (reversing Ninth Circuit's application of continuing violations doctrine to "serial violations" and holding doctrine inapplicable to claims arising out of discrete acts of discrimination), that the first of these two ways may be used only with respect to claims of a hostile work environment (of which, in this case, there are none). *See Maxwell v. Postmaster Gen. of U.S.*, 986 F. Supp. 2d 881, 884 (E.D. Mich. 2013) (noting that "subsequent to *Morgan*, the Sixth Circuit has also considered the continuing violations doctrine and found, outside the context

of hostile work environment cases, that it only applies where the challenged acts are part of a 'longstanding and demonstrable policy of discrimination[ ]'" and that "*Morgan* overturned prior Sixth Circuit case law allowing application of continuing violations doctrine to serial violations" (citing *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir.2003))).

Plaintiff argues that the continuing violations doctrine should be invoked here because he has alleged that "Defendants' past discriminatory conduct outside of the statute of limitations period sufficiently relates to Defendants' conduct occurring within the limitations period, which is the Faculty Senate Committee's Final Decision." (*Id.* (citing Doc. No. 22 at ¶ 176)). But as just discussed, the Sixth Circuit has explained that the continuing violations doctrine is inapplicable to claims arising out of discrete (even if serial) acts of discrimination. *See Maxwell*, 986 F. Supp. 2d at 884. Instead, the doctrine applies only where the challenged acts are part of a "longstanding and demonstrable policy of discrimination." *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003). Plaintiff has not attempted to justify application of the continuing violations doctrine in this manner, nor has he alleged the existence of any such policy. True, he does not explicitly *disclaim* the existence of a "policy of discrimination." But such disclaimer is not necessary for the Court to find the continuing violations doctrine inapplicable at the motion-to-dismiss stage if the complaint does not allege circumstances that demonstrate a policy of discrimination. *Gentry v. The Renal Network*, 636 F. Supp. 2d 614, 618 (N.D. Ohio 2009) (finding the continuing violations doctrine inapplicable because the plaintiff had not alleged in the complaint factual circumstances demonstrating the existence of a policy of discrimination (quoting *E.E.O.C. v. Penton Indus. Publ'g Co.*, 851 F.2d 835, 838 (6th Cir.1988))). In any event, Plaintiff basically disclaims reliance on a policy of discrimination when he claims,[9] in his Amended Complaint, that "Plaintiff's case

---

[9] As noted immediately above, this claim is to no avail.

falls under the first continuing violation category" because (according to him) the past discriminatory actions are "sufficiently related to Defendants' conduct during the limitations period" and does not mention the second category (*i.e.*, a policy of discrimination). (Doc. No. 22 at ¶ 176). Therefore, the Court will not invoke the doctrine to allow consideration of alleged discriminatory acts that occurred outside of the limitations period, as it is clear from the face of the Amended Complaint that the continuing violations doctrine does not apply.

 E. *Equitable Tolling/Equitable Estoppel*

 Plaintiff argues that Defendants' discriminatory acts are subject to equitable tolling and equitable estoppel. (Doc. No. 37 at 16-19). Plaintiff argues that Defendants' 2017-2018 Student Handbook includes the section "Grievance Procedures in the State of Tennessee" and instructs all students to exhaust administrative complaint processes before involving third parties. (*Id.* at 16 (citing Doc. No. 37-20 at 9)). Plaintiff argues that this excerpt from the handbook induced his delay in filing. (*Id.*). Plaintiff also argues that it was reasonable for Plaintiff to wait on the Faculty Senate Committee's final decision, Defendants should have known that their "gross delays in investigation time and producing [their] Faculty Senate decision would induce the Plaintiff to delay filing suit." (*Id.* at 16-17).

 Defendants argue that equitable tolling and equitable estoppel do not excuse Plaintiff's untimeliness in filing suit. (Doc. No. 38 at 2). Defendants argue that equitable tolling is not applicable because "the doctrine only applies if the plaintiff, 'despite all due diligence . . . is unable to obtain vital information bearing on the existence of his claim.'" (*Id.* at 3 (quoting *Seoane-Vazquez v. Ohio St. Univ.*, 577 F. App'x 418, 426 (6th Cir. 2014))). Defendants' cite *Seoane-Vazquez*, where the Sixth Circuit held that a professor challenging a university's tenure decision was not entitled to equitable tolling simply because he delayed filing suit until his internal appeal

of that decision had been resolved. 577 F. App'x at 426. Defendants argue that Plaintiff's equitable tolling argument fails for the same reasons discussed in *Seoane-Vazquez*. Defendants assert that their "administrative appeal procedures exist only as an academic or administrative remedy for [their] prior dismissal decision—not as an opportunity for Plaintiff to influence that decision retroactively." (Doc. No. 38 at 3). Thus, Defendants contend that "[t]he outcome of Plaintiff's internal appeal was therefore not vital information that had bearing on the existence of his claim of discrimination." (*Id.*).

Additionally, Defendants argue that Plaintiff's equitable estoppel argument likewise fails because "'[e]quitable estoppel requires conduct specifically designed to prevent the plaintiff from suing in time.'" (*Id.* at 3 (quoting *Allsbrook v. Concorde Career Coll., Inc.*, 469 F. Supp. 3d 805, 841 (W.D. Tenn. 2020))). Defendants maintain that this "[u]sually [ ] must involve a misrepresentation 'dealing with the actual filing of a lawsuit,' such as inducing a plaintiff to refrain from filing with a promise not to raise timeliness as a defense" and "[v]ague statements or ambiguous behavior do not qualify." (*Id.* at 3 (quoting *Allsbrook*, 469 F. Supp. 3d at 841)). Defendants argue that there is no alleged improper conduct on the part of Defendants, and that the Court therefore should not invoke the doctrine of equitable estoppel to save Plaintiff's untimely federal claims.

Where the expiration of the limitations period appears on the face of a complaint, and the "plaintiff fails to allege facts sufficient to demonstrate that equitable tolling relief is warranted, a court may dismiss an untimely claim pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Payne v. Lucite Int'l*, No. 13-2948-STA-TMP, 2014 WL 2826343, at *6 (W.D. Tenn. June 23, 2014) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 501 (6th Cir. 2001) (affirming district court's dismissal of untimely discrimination claims under Rule 12(b)(6) because equitable tolling was not

warranted "[b]ased on the facts alleged in the complaint"); *A've v. Mich. Dep't of Corr*., 12 F. App'x 293, 295 (6th Cir. 2001) (affirming district court's dismissal of an untimely discrimination claim under Rule 12(b)(6) because "A've has not alleged any facts that would justify equitable tolling, and none is apparent from the record")); *see also Cheatom*, 587 F. App'x at 281 (affirming a district court's dismissal pursuant to rule 12(b)(6) and decision to not apply equitable tolling to the plaintiff's claims).

The Sixth Circuit has laid out five factors to be considered in determining whether the doctrine of equitable tolling should apply: "(1) a lack of notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement [(*i.e.*, the particular limitations period at issue)]; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement [(*i.e.*, the particular limitations period at issue)]." *Truitt v. County of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998). "The Sixth Circuit has repeatedly cautioned that equitable tolling should be applied sparingly." *Moss v. Akers*, No. 5:19CV-P44-TBR, 2019 WL 5430592, *3 (W.D. Ky. Oct. 23, 2019) (internal quotation marks omitted). Courts should also be guided by the underlying principle that "equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Graham-Humphreys v. Brooks Museum of Art, Inc*., 209 F.3d 552, 560-61 (6th Cir. 2000). (citations omitted).[10] "[T]he

---

[10] The undersigned here will reiterate what he has said previously about multi-factor tests generally:

> The undersigned has noted on multiple occasions that multi-factor (or balancing) tests, though often having considerable desirability and merit, tend to foster outcomes that are unpredictable on the front end, given such tests' subjectivity." *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *16 (M.D. Tenn. Aug. 28, 2020) (quoting Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1050 (1997) (proposing a multi-factor test to resolve civil limitations issues, while conceding that when courts "apply[ ] a multi-factor test, [it is] always an unpredictable endeavor") and Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 95 (1995) (proposing multi-

decision to grant equitable tolling 'lies solely within the discretion of the trial court.'" *Betts v. Central Ohio Gaming Ventures, LLC*, 351 F. Supp. 3d 1072, 1075 (S.D. Ohio 2019).

"Equitable estoppel . . . is invoked in cases where the defendant takes active steps to prevent the plaintiff from suing in time, such as by hiding evidence or promising not to plead the statute of limitations." *Bridgeport Music v. Diamond Time*, 371 F.3d 883, 891 (6th Cir. 2004).[11] Whether equitable estoppel should be applied is based "on a defendant's improper conduct as well as a plaintiff's actual and reasonable reliance thereon." *Id*. Further, prior to invoking equitable estoppel, the plaintiff "must demonstrate that his ignorance is not attributable to a lack of diligence on his part." *Id*. "The facts substantiating the doctrine must be set forth in the complaint with particularity as required by Federal Rule of Civil Procedure 9(b)." *Cheatom*, 587 F. App'x at 280 (citation omitted).

The Court will not invoke either equitable tolling or equitable estoppel to toll the limitations period. Plaintiff does not allege facts that plausibly show that, when considering the above-outlined factors, Plaintiff is entitled to equitable tolling of the limitations period. Plaintiff argues that equitable tolling is warranted because Defendants "induced" him to delay filing suit through the language in Defendants' 2017-2018 Student Handbook's[12] ("the Handbook") that

---

factor test to resolve collateral estoppel issues, while conceding that its drawback is that it "would produce unpredictable resolutions of collateral estoppel issues, in that it is so flexible and calls for very subjective judicial determinations")).

*Acosta v. Peregrino*, No. 3:17-CV-01381, 2020 WL 5995049, at *6 (M.D. Tenn. Oct. 9, 2020).

[11] Courts have been known to treat equitable estoppel as a distinct grounds for—*i.e.*, a particular basis for applying— equitable tolling. *See Law v. Bioheart Inc*., No. 07-02177, 2007 WL 9706676, at *3 (W.D. Tenn. July 26, 2007) ("Given this factual context, the Court finds that the doctrine of equitable estoppel provides adequate grounds for the Court to exercise its discretion in equitably tolling the applicable statute of limitations."). Thus, the Court will treat equitable estoppel as a particular basis for equitable tolling, such that general principles regarding equitable tolling (such as this Court's discretion to apply it) also apply to equitable estoppel.

[12] This is the version of the Handbook relevant to Plaintiff's claims.

includes instructions regarding internal review in the section entitled "Grievance Procedures in the State of Tennessee." (Doc. No. 37 at 16; Doc. No. 15-4 at 7). The section of the Handbook provides that when a student has a grievance, "[t]he student has the right to call on the state of Tennessee and its appropriate agency to determine the course of action" but encourages students to "seek a resolution of such matters through the institution's complaint procedure before involving others."[13] (Doc. No. 37-20 at 9). Plaintiff contends that because he was pursuing his complaint through Defendants' internal complaint procedures, as the Handbook encourages, he was "induced" to delay filing suit, and therefore, equitable tolling is warranted. The Court disagrees that the specific Handbook language is enough to "induce" a student to refrain from filing a federal lawsuit. This section of the Handbook discusses how to reach out to *agencies* of the state of Tennessee when a student has a complaint against the university. The language does not mention the possibility of filing, or (more to the point) refraining from filing, a lawsuit (in either state or federal court). Thus, this section of the Handbook in no way indicates that a student must follow the internal grievance procedures in lieu of filing a lawsuit. Thus, the Court does not find that Plaintiff was "induced" to delay filing suit because of this language.

Plaintiff does not argue, or allege in the Complaint, that he had a lack of notice of the limitations period, and a lack of constructive knowledge of the limitations period. Instead, in the Complaint he alleges that he had a "lack of knowledge . . . of the truth as to the facts in question" because he did not yet know "Defendant's final decision." (Doc. No. 22 at ¶ 169). However, similar to the plaintiff in *Seoane-Vazquez*, Plaintiff had all the necessary information to file a timely

---

[13] The Handbook may be considered in connection with the instant motion to dismiss because it is referenced in the Complaint and integral to plaintiff's claims. *See Comm. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (holding that a district court may consider documents referenced in the pleadings that are integral to the claims in deciding motion to dismiss). Plaintiff attaches the 2017-2018 Student Handbook to his Response. (*See* Doc. No. 37-20.) The Handbook has been expressly and extensively referenced in the Complaint, and the Handbook is integral to Plaintiff's claims. Accordingly, the Court considers this document in its entirety for purposes of the pending Motion.

lawsuit after he was dismissed from VUSM, and any "delay[] [in Defendants'] resolution of Plaintiff's internal appeal . . . does not entitle Plaintiff to equitable tolling." 577 F. App'x at 427. Further, Plaintiff does not allege or argue that he was diligent in pursuing his rights. Thus, it is apparent from the face of the Amended Complaint that four out of five of the equitable tolling factors do not weigh in favor of tolling the limitations period. And where, as here, the remaining factor (absence of prejudice to the defendant) is rendered immaterial. *Graham-Humphreys*, 209 F.3d at 562 n.12 (citations omitted).

Indeed, a district court in this circuit has rejected a nearly identical argument. In *Cobble v. Spalding University*, No. 3:16-cv-00525-CRS, 2017 WL 382245 (E.D. Ky. Jan. 26, 2017), cited by Defendants, a student brought an untimely ADA claim and in response to the defendant's motion to dismiss, asked the district court to toll the running of the limitations period because he had appealed his final grades using the university's internal procedures, and that process was not final until after the limitations period ended. *Id*. at *4. The court declined to invoke the doctrine of equitable tolling, explaining that although the plaintiff alleged "that he appealed his failing grades using Spalding University's internal grievance procedure, [] the Supreme Court has noted that 'the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods.'" *Id*. (quoting *Del. State Coll. v. Ricks*, 449 U.S. 250, 261 (1980)). *Ricks* involved employment law claims, nevertheless, the court applied the rationale in *Ricks* to the student-university setting, and held that the plaintiff was not entitled to equitable tolling. *Id*.

In consideration of the factors outlined above, and the persuasive authority in *Cobble*, the Court will likewise deny Plaintiff's request to toll the limitations period here, it is not apparent

from the face of the Amended Complaint that Plaintiff is not entitled to equitable tolling.[14] Additionally, as noted above, "equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control," *Graham-Humphreys*, 209 F.3d at 560-61, and here, there is no such avoidable circumstance alleged.

The doctrine of equitable estoppel likewise does not save Plaintiff's federal claims from dismissal. As noted above, the applicability of equitable estoppel is based "on a defendant's improper conduct as well as a plaintiff's actual and reasonable reliance thereon." *Bridgeport Music*, 371 F.3d at 891. Plaintiff makes no allegations in his Complaint, and does not argue in his Response, that Defendants acted improperly, aside from asserting that the "Grievance Procedures in the State of Tennessee" provision of the handbook somehow induces students to refrain from filing. (Doc. No. 37 at 16 (citing Doc. No. 37-20 at 9)). However, as the Court discussed above, that provision of the Handbook clearly applies to when and how to reach out to state agencies when a student has a complaint regarding their academic program. It does not guide a student to follow such procedures in lieu of filing a lawsuit and indeed does not mention the prospect of a lawsuit at all. Thus, the language cannot be construed (even when construing it in Plaintiff's favor as required at this stage) to somehow induce students to delay filing a lawsuit until the completion of the internal proceedings. Accordingly, the inclusion in the Handbook of the provisions cited by Plaintiff cannot be considered improper conduct by Defendants intended to induce Plaintiff to delay in filing his lawsuit. Therefore, the Court in its discretion will not apply the doctrine of equitable estoppel to save Plaintiff's federal claims from being time-barred.

---

[14] As indicated above, equitable estoppel may be considered a separate basis for applying equitable tolling. To the extent that is true, the question of whether equitable tolling is properly based on equitable estoppel in particular has not yet been resolved, but is resolved separately immediately below.

Accordingly, the Court finds that it is clear from the face of the Amended Complaint that Plaintiff's federal claims are time-barred. Thus, the Court will grant Defendants' Motion in part and dismiss Counts I (ADAAA) and Count II (Rehabilitation Act).

## II. Plaintiff's State-Law Claims

### 1. *Breach of Express and Implied Contract (Counts III)*

To allege a breach of contract under Tennessee law, a plaintiff must plead (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breach. *Thomas v. Meharry Med. Coll.*, 1 F.Supp.3d 816, 828 (M.D. Tenn. 2014). A contract can be either express or implied. *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990).

### A. *Existence of an Enforceable Contract*

When applying Tennessee law, the Sixth Circuit has stated that "the student-university relationship is contractual in nature although courts have rejected a rigid application of contract law in this area." *Sifuna v. S. Coll. of Tennessee, Inc.*, No. 17-5660, 2018 WL 3005814, at *2 (6th Cir. Apr. 5, 2018) (quoting *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988)). The Tennessee Supreme Court has not identified a standard to apply when a dispute arises out of a university/student relationship, but the Sixth Circuit has stated that it believes that the Tennessee Supreme Court would apply a deferential standard of "reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Doherty*, 862 F.2d at 577 (quoting *Lyons v. Salve Regina Coll.*, 565 F.2d 200, 202 (1st Cir. 1977)); *Anderson*, 450 F. App'x at 502 (noting the likely applicability of this standard to an implied contract).

Courts have regularly found from a school publication an implied contract between a school and a student, even when that publication contains disclaimer language.[15] *E.g.*, *Atria*, 142 F. App'x at 255 (finding that language in the handbook that the policies "are not intended to be all-inclusive and do not constitute a contract" prevented an express contract, but allowed for an implied contract); *Doe v. Vanderbilt Univ.*, No. 3:18-CV-00569, 2019 WL 4748310, at *12 (M.D. Tenn. Sept. 30, 2019) (citing *Atria*) ("*Doe I*"); *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 890 (M.D. Tenn. 2018) ("*Doe II*") ("Because the Bruin Guide attempts to disclaim its entire contractual force, the Court will not consider the disclaimer, and utilizes the Bruin Guide as defining the terms of the implied contractual relationship between Doe and Belmont."). "Catalogs, manuals, student handbooks, bulletins, circulars and regulations of a university help define the implied contractual relationship." *Doe I*, 2019 WL 4748310, at *12 (citing *Atria*).

Where a case arises from an academic context, as this one does, "judicial intervention in any form should be undertaken only with the greatest reluctance." *Doherty*, 862 F.2d at 576 (citing *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226 (1985) (noting that federal courts are unsuited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions")). "This is the case especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession."[16] *Id*. A failing grade is subject to substantial deference from the courts as an academic decision. *Sifuna*, 2018 WL 3005814, at *2.

---

[15] The Court pauses to note that there are two kinds of implied contracts: contracts implied in fact, and contracts implied in law. *Stahl v. United States*, 141 Fed. Cl. 396, 404 (2018). The latter kind is said to exist when the claimant has a valid promissory estoppel theory. *See id.* ("Promissory estoppel is another name for an implied-in-law contract claim."). In this case, Plaintiff alleges both kinds, (*See* Count III and Count V); as discussed below, he asserts a promissory estoppel theory. But here the Court is addressing his claim of a contract implied in fact.

[16] Citing *Doherty*, Defendants argue that the Court should dismiss the breach-of-contract claim, based on the "academic deference doctrine." (Doc. No. 32 at 21-23 (citing *Doherty*, 862 F.2d at 576)). Defendants assert that

Here, Defendants argue that despite Plaintiff's allegation that Defendants have breached an express contract with Plaintiff, no express contract has been alleged to exist. (Doc. No. 32 at 15). Defendants argue that Plaintiff's express contract claim should be dismissed because Plaintiff does not allege that he entered into an oral or written contract with Vanderbilt. (*Id.* at 16). Further, Defendants assert that "student handbooks, transcripts, and admission letters do not constitute written [meaning express] contracts unless they specifically state otherwise" and "the Vanderbilt Student Handbook specifically states that it does not constitute a contract." (*Id.*). Thus, Defendants assert that "Plaintiff's bare statement that an express contract exists, without stating what that contract is, is not sufficient to state a claim upon which relief can be granted." (*Id.*).

The Court agrees with Defendants that Plaintiff has not stated a claim for breach of an express contract. Plaintiff alleges that "Plaintiff's relationship with Defendant is contractual in nature, both express and implied." (Doc. No. 22 at ¶ 37). But this allegation merely states a legal conclusion, and conclusory allegations do not count towards the showing of plausibility required by *Twombly* and *Iqbal*; Plaintiff needed to allege factual matter suggesting an express contract but failed to do so. And while the Sixth Circuit has stated that "the student-university relationship is contractual in nature," it has explained that the student-university relationship creates an implied,

_____

"Plaintiff's breach of contract claims stem from Vanderbilt's decision to dismiss him from the medical school. That decision was an academic one, based on Plaintiff's inability to fulfill Vanderbilt School of Medicine's degree requirements[.]" (*Id.* at 22). Defendants assert that the "Court should adhere to the academic deference doctrine and dismiss Plaintiff's breach of contract claims pursuant to Federal Rule of Civil Procedure 12(b)(6)." (*Id.*).

The Court agrees with Defendants that a university's academic decisions are entitled to "substantial deference," especially in the situation, such as the one at hand, where the challenge is to a university's *academic* action, rather than a *disciplinary* action. *See Joiner v. Meharry Med. Coll.*, No. 3:18-CV-00863, 2020 WL 7027505, at *6 (M.D. Tenn. Nov. 28, 2020) (Richardson, J.) (explaining that judicial intervention in the academic context should only be undertaken only "with the greatest reluctance," but "a challenge to a disciplinary action requires a more 'intrusive analysis' than does a challenge to an academic action" (quoting *Doherty*, 862 F.2d at 577)). However, Defendants have cited no authority for the proposition that every breach-of-contract claim arising from an educational institution's academic decision should be dismissed from the outset on the basis of the academic-deference doctrine. Instead, the Court will keep in mind the substantial deference that is paid to such decisions in evaluating whether Plaintiff's breach-of-contract claim survives Rule 12(b)(6) scrutiny.

not an express, contract. *See Atria*, 142 F. App'x at 255; *see also Doe II*, 334 F. Supp. 3d at 890 ("Generally speaking, this [student-university contractual] relationship is implied as opposed to express." (citing *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011)).

Therefore, the Court finds that there was no express contract between the parties.

### B. *Breach of Implied Contract*

Although the Complaint does not plausibly allege that there was an express contract, the Court finds that the Complaint does adequately allege the existence of an implied contract between Defendants and Plaintiff that arose from the student-university relationship that is adequately alleged in the Amended Complaint. Plaintiff alleges numerous grounds for breach of his implied alleged contractual relationship with Vanderbilt. Plaintiff alleges that Defendants breached their contractual commitment to Plaintiff:

> 1. "by failing to provide him with accurate advice about accommodations available to him;"
>
> 2. "by failing to provide him with timely accommodations for course work and clinical rotations as required by the ADA;"
>
> 3. "by requiring him to complete additional assignments along with the work required in his course remediation. No other students in the court had to complete this additional work;"
>
> 4. "by ineffectively investigating the substance of the evaluations that formed the basis for his dismissal;"
>
> 5. "by failing to provide an unbiased and neutral panel to sit on the Promotions Committee, Executive Committee, and Faculty Committee;" and
>
> 6. "by having an untimely appeals process that clearly failed to address the appeal issues raised by Plaintiff."

(Doc. No. 22 at ¶¶ 134-35).

Defendants argue that "Plaintiff has failed to plead sufficient facts to allow a finding of breach of implied contract" because "the duties that Plaintiff alleges Vanderbilt breached do not

appear in any guiding document and cannot be the bases of an actionable claim for breach of contract." (Doc. No. 32 at 16). In the Response, Plaintiff does not point to any language in any guiding document of Defendants that he contends Defendants allegedly breached, except for a document entitled *Patient Rights & Responsibilities*, which he allegedly was provided to him by the EAD. He asserts that the *Patient Rights & Responsibilities* document "stipulated that Plaintiff would have the right to be involved in all aspects of his [health]care and participate in decision regarding his [health]care." (Doc. No. 37 at 21 (citing Doc. No. 22 at ¶ 49)). According to Plaintiff, Defendants breached this language, because he was not able to participate in decisions regarding his care when he "requested modification to several conditions of his treatment plan that were rejected" (*Id*. (citing Doc. No. 22 at ¶ 59)).

In Defendants' Reply, they reiterate that

Plaintiff has not plausibly alleged a breach of contract because he does not identify any specific provision in any university materials that Vanderbilt allegedly breached. [*See generally* Doc. 17-1 ¶¶ 130-141.] At most, he contends Vanderbilt promised "to follow the provisions of the Vanderbilt University Student Handbook and student policies in a fundamentally fair manner." [*Id*. ¶ 132(c).] This is precisely the sort of vague, generalized aspirational statement that is not actionable in a breach-of-contract claim. *See Z.J.*, 355 F. Supp. 3d at 699-700; [*Doe* II] , 334 F. Supp. 3d at 890.

(Doc. No. 38 at 4).

### i. Breaches #1 and #2

As noted above, Plaintiff alleges Defendants breached the implied contract "by failing to provide him with accurate advice about accommodations available to him;" ("Breach #1") and "by failing to provide him with timely accommodations for course work and clinical rotations as required by the ADA" ("Breach #2") (Doc. No. 22 at ¶ 135-36). Plaintiff has not pointed the Court to any guiding document of Defendants, such as the Handbook or a policy manual, that includes terms that Defendants allegedly breached by failing to do these things. *See Joiner v. Meharry Med.*

*Coll.*, No. 3:18-CV-00863, 2020 WL 7027505, at *10 (M.D. Tenn. Nov. 28, 2020) (dismissing the plaintiff's allegation that the university breached the implied contract by ordering "his academic dismissal without considering that he suffered harassment" in part because the "[p]laintiff has pointed the Court to no indication, in the SOM manual or elsewhere, that such consideration was required before dismissing him for repeated academic issues"); *Rice v. Belmont University*, No. M2018-01092-COA-R3-CV, 2020 WL 2790457, at *4 (Tenn. Ct. App. May 29, 2020) (finding the plaintiff's allegation that "Belmont wrongfully treated his request for a transfer from the doctoral program to the master's program as a request to be readmitted into the doctor's program" did not allege nonperformance amounting to a breach, because the plaintiff "failed to identify any provision in the Handbook or the Guide that required Belmont to treat his transfer request differently"); *Doe II*, 334 F. Supp. 3d at 890 (explaining that the plaintiff's allegation of a biased decisionmaker failed to state a claim for breach of contract because "[the plaintiff] acknowledges the 'lack of any language regarding impartiality' in the Sexual Misconduct Accountability Policy. . . .").

Plaintiff does point to the *Patient Rights & Responsibilities* document, suggesting that it contains language imposing obligations that Defendants violated by their above-reference alleged failings. (Doc. No. 37 at 21). But in fact it does not. The document states that "as a patient at Vanderbilt University Medical Center," Plaintiff had the right to "receive care in a safe setting, free from any form of abuse or harassment" and "a fair and objective review of any complaint [he had] against [his] health plan, doctors, hospitals, or other health care personnel." (Doc. No. 22 at ¶ 47; Doc. No. 37-8). The document also states that Plaintiff would have the right "to be involved in all aspects of [his] care and to participate in decisions regarding [his] care." (*Id*. at ¶ 48; Doc. No. 37-8). As noted above, Plaintiff argues that Defendants breached the language in this

document, because he "requested modification to several conditions of his treatment plan that were rejected" thus he "could not participate in decisions regarding his care." (*Id.* (citing Doc. No. 22 at ¶ 59)). This argument is flawed, however.

The cited language by Plaintiff does not impose a duty on Defendants to "provide him with accurate advice about accommodations available to him" and "provide him with timely accommodations for course work and clinical rotations." Instead, the document requires Plaintiff to be allowed to be involved, as a patient of Vanderbilt University Medical Center, "in all aspects of [his] care and to participate in decisions regarding [his] care." (Doc. No. 22 at ¶ 48). Even construed liberally, this language in no way binds Defendants to offer Plaintiff advice and accommodations in compliance with the ADA. Accordingly, the language relied on by Plaintiff does not aid Plaintiff in his endeavor to state a claim for breach of contract based on Breaches #1 and #2.

Therefore, Plaintiff has not alleged a breach-of-contract claim based on alleged breaches #1 and #2. Plaintiff's remedy for such a violation would be through the ADA, a claim which he in fact did bring (as discussed above), and not through a breach-of-contract claim.

*ii. Breach #3*

Plaintiff alleges that Defendants breached the implied contract "by requiring him to complete additional assignments along with the work required in his course remediation. No other students in the course had to complete this additional work" ("Breach #3"). (Doc. No. 22 at ¶ 135). Plaintiff again fails to point to any guiding document or policy of Defendants that would require Defendants to refrain from requiring a student, such as Plaintiff, to complete particular assignments not given to other students to remediate a course. Thus, Plaintiff here does not allege nonperformance of Defendants amounting to a breach. Additionally, as the Court has said before

when reviewing a plaintiff's breach-of-contract claim against a university, when the plaintiff alleges a breach of contract action against a university based on "bad grades or receiving academic treatment worse than that received by other students . . . the Court [ ] is not inclined to second-guess the academic dismissal of a student; instead, as noted above, it gives great deference to the school in making such a decision, especially when that school operates in the health care field." *Joiner*, 2020 WL 7027505, at *11 (citing *Doherty*, 862 F.2d at 576). Accordingly, Plaintiff has not alleged a breach-of-contract claim based on alleged Breach #3.

### iii. Breach #4 and #5

Plaintiff alleges that Defendants breached the implied contract "by ineffectively investigating the substance of the evaluations that formed the basis for his dismissal" ("Breach #4") and "by failing to provide an unbiased and neutral panel to sit on the Promotions Committee, Executive Committee, and Faculty Committee" ("Breach #5"). (Doc. No. 22 at ¶ 135). In their Motion, Defendants argue that Plaintiff fails to state a breach-of-contract claim for these specific alleged breaches, and Plaintiff fails to mention these specific breaches in his Response. "Where a party fails to respond to an argument in a motion to dismiss 'the Court assumes he concedes this point and abandons the claim.'" *ARJN #3 v. Cooper*, 517 F. Supp. 3d 732, 750 (M.D. Tenn. 2021) (Richardson, J.) (quoting *PNC Bank, Nat. Ass'n v. Goyette Mech. Co., Inc*., 88 F. Supp. 3d 775, 785 (E.D. Mich. 2015)); *see also Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007) (affirming the district court's conclusion that the plaintiff abandoned certain claims by failing to raise them in his brief opposing the government's motion to dismiss). Accordingly, the Court finds that Plaintiff has abandoned his theory for breach of based on alleged Breaches #4 and #5.

However, even if his claims were not abandoned, the Court finds alternatively that they fail to state a claim upon which relief may be granted. As to Breach #4, Plaintiff has pointed to no

language (via the Response, or the Amended Complaint) in the Handbook or any other guiding document that lays out any requirements an investigator must follow during the course of an investigation. The Handbook merely requires that an investigation be completed. (Doc. No. 22 at ¶ 97 ("EAD will conduct an investigation of allegations concerning prohibited discrimination (usually within ninety [90] business days) [and] will issue a finding to the appropriate University official, and will seek to resolve the matter.")); *see also Doe II*, 334 F. Supp. 3d at 894 (finding that a similar breach-of-contract claim failed to state a claim where the policy at issue only required an investigation and "contain[ed] no requirements on what means an investigator must utilize to conduct any interviews or evaluate evidence");

As to Breach #5, Plaintiff again points to no language in the Handbook, or other guiding document, that requires impartiality in the proceedings. However, even if he had, (or even if such impartiality is impliedly required through the implied covenant of good faith and fair dealing),[17] "[i]n the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias." *Atria*, 142 F. App'x at 256. "To overcome that presumption, [Plaintiff] must plausibly allege 'personal animosity, illegal prejudice, or a personal or financial stake in the outcome' on the part of [Vanderbilt or VUSM] officials." *Doe II*, 334 F. Supp. 3d at 894 (quoting *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985)). And to plausibly allege these things, Plaintiff must set forth allegations factual matter, and not mere conjecture or unsupported conclusions. *See Doe v. Cummins*, 662 F. App'x 437, 450 (6th Cir. 2016) (stating that, to survive a motion to dismiss, allegations of bias "cannot be based on speculation or inference"); *Doe v. Ohio State Univ.*, 219 F.Supp.3d 645, 658 (S.D. Ohio 2016) ("To survive a motion to dismiss, [the plaintiff] needs to allege specific, non-conclusory facts that

---

[17] Another judge of this Court has assumed this *arguendo*. *Doe II*, 334 F. Supp. 3d at 894.

if taken as true show actual bias.") "Stated differently, a 'mere belief that [school officials] acted with . . . ulterior motives' during the course of the investigation 'is insufficient to state a claim for relief.'" *Doe II*, 334 F. Supp. 3d at 894 (quoting *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016)).

The Amended Complaint alleges that the composition of the Faculty Senate Committee, which was "three fellow medical students instead of elected members of the entire Vanderbilt student body," created a "risk of bias as the entire Faculty Senate Committee would be comprised of individuals beholden to VUSM." (Doc. No. 22 at ¶ 102). Plaintiff alleges no other facts that the Court could construe (even liberally in Plaintiff's favor) that the individuals on the Faculty Senate Committee were biased. Indeed, the Amended Complaint further alleges that Plaintiff *chose* to move ahead with three medical students comprising the Faculty Senate Committee so that he could have his grievance heard during the summer. (*Id.*). Plaintiff's allegations of bias are mere speculation, and he has not alleged any facts to plausibly suggest *actual* bias. Thus, he has not plausibly alleged a breach-of-contract claim based on Breach #5.

### iv. Breach #6

Finally, Plaintiff alleges that Defendants breached the alleged implied contract "by having an untimely appeals process that clearly failed to address the appeal issues raised by Plaintiff." (Doc. No. 22 at ¶¶ 134-35) ("Breach #6"). Breach #6 is the only alleged breach with respect to which Plaintiff's points to language in Defendants' Handbook to support his claim of breach.

In the Amended Complaint, Plaintiff points to the Handbook that he describes as the "controlling Vanderbilt grievance procedural policy." He quotes the following portion of the Handbook:

> After each case, the committee shall write its report. The report should be completed within three weeks and shall include a statement of the committee's

findings, the basis for those findings, and, if necessary, recommendations for any corrective action that should be taken…The report, including the vote and any dissenting statements, shall be sent to the Chancellor within one week after completion…The Chancellor shall communicate his decision to the committee…The Office of the Chancellor shall then notify the student and the other affected persons, in writing, of the final decision, usually within thirty (30) days of receipt of the Committee's report, during the academic year.

(Doc. No. 22 at ¶ 110). The Amended Complaint further alleges that Plaintiff was not informed of the Chancellor's final decision until nearly twenty months after the grievance hearing was held. (*Id*. at ¶¶ 105-112).

In their Motion, Defendants argue that Plaintiff cannot state a breach-of-contract claim based on Breach #6, because the Handbook "suggests timeframes but does not set them in stone." (Doc. No. 32 at 21). Defendants offer the following examples:

"the Chancellor's office shall refer the grievance to the Faculty Senate Committee on Students Affairs, ***usually*** within thirty (30) days," "[t]he preliminary investigation will ***usually*** by completed within thirty (30) days," "[t]he report ***should*** [***not shall***] be completed within three weeks," and "[t]he Office of the Chancellor shall then notify the student…of the final decision, ***usually*** within thirty (30) days of receipt of the Committee's report, during the academic year."

(Doc. No. 32 at 21 (citing the Handbook at 8-9). Defendants therefore argue that there was no breach because the Handbook merely "suggests" time frames. (*Id*.).

In the Response, Plaintiff argues that "[w]hen the duration of a contract is indefinite, it is to be performed in a reasonable amount of time." (Doc. No. 37 at 23 (citing *Big Cola Corp. v. World Bottling Co.*, 134 F.2d 718, 721 (6th Cir. 1943)). He argues that notifying "a student almost two years later of a final decision is unreasonable" and he has therefore stated a breach-of-contract claim.

The Court finds that Plaintiff's breach-of-contract claim based on Breach #6 fails because Plaintiff does not plausibly allege that Defendants breached any promise (allegedly) created by the language in the Handbook on which Plaintiff here relies. Plaintiff points to the language that states

that Office of the Chancellor will notify a study "usually" within thirty days of the final decision. (Doc. No. 32 at 21). This statement does not reflect a promise as to the timeliness of the grievance procedure process. Another district court, in ruling that the plaintiff did not state a claim for breach of contract, explained that the handbook language at issue stated that disciplinary procedure "ordinarily" take 3 to 6 weeks to complete. *Sonoiki v. Harvard Univ.*, No. 19-CV-12172, 2020 WL 3416516, at *11 (D. Mass. June 22, 2020). The court explained that "[a]lthough the contract provides guidance for the timing of complaints and the duration of proceedings, neither can reasonably be considered a guarantee as to either" and thus there was not a specific promise that was breached. *Id*. Likewise, here, the Handbook language at issue merely provides guidance as to the length of grievance proceedings by stating how long those proceedings "usually" take. This is simply not a promise as to the length of the grievance procedure and therefore cannot support a breach-of-contract claim.

Accordingly, Defendants' Motion will be granted as to Plaintiff's breach-of-contract claim based on Breach #6.

### 2. *Breach of Implied Covenant of Good Faith and Fair Dealing (Count IV)*

While Tennessee courts have consistently found that an implied covenant of good faith and fair dealing applies to every contract, *Dick Broad. Co*., 395 S.W.3d at 661, Tennessee courts have also consistently found that a breach of the duty of good faith and fair dealing "is not a cause of action in and of itself but [is] a part of a breach of contract cause of action."[18] *Univ. of the South II*, 2011 WL 1258104, at *18 (quoting *Lyons v. Farmers Ins. Exch*., 26 S.W.3d 888, 894 (Tenn.

---

[18] Below, the undersigned provides his view about how breach of the covenant of good faith and fair dealing comprises "a part" of a breach-of-contract claim: essentially, if the defendant is properly considered to have breached the covenant of good faith and fair dealing—meaning, in essence, engaging in bad faith and unfair actions that prevent the occurrence of circumstances whereby the plaintiff would get the benefit of his bargain—the defendant cannot raise the non-occurrence of such circumstances as a defense to the plaintiff's breach of contract claim.

Ct. App. 2000)); *see also Shah*, 338 F.3d at 572 ("Breach of the implied covenant of good faith and fair dealing is not an independent basis for relief."). Accordingly, Count IV is dismissed on the basis that the claim it purports to state is not cognizable as a separate cause of action.

Alternatively, even if the Court were to view Count IV as asserting a breach-of-contract claim of which the breach of the covenant of good faith and fair dealing was (merely) "a part," *Univ. of the South II*, 2011 WL 1258104, at *18, the claim still would fail, for two reasons. First, Plaintiff does not even identify any breach-of-contract claim of which the breach of the covenant of good faith and fair dealing was a part. Second, even if Plaintiff could claim that he impliedly here identified, as such breach-of-contract claim, his above-referenced claim of the breach of implied contract created by the Handbook, as discussed above Plaintiff has not adequately alleged that Defendants breached such implied contract. *See id.*; *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d at 699-700.

And in any event, Plaintiff has also not adequately alleged a breach of the covenant of good faith and fair dealing, properly construed. As the undersigned has previously explained regarding the historically under-analyzed topic of how a breach of the implied covenant of good faith and fair dealing can be of significance even if it is not itself a cognizable cause of action:

> While the implied covenant does not create new contractual rights or obligations, it protects the parties' reasonable expectations as well as their rights to receive the benefits of their agreement. Thus, "there is an implied covenant of good faith and fair dealing in every contract, whereby neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." The general idea, at least in pertinent part, seems to be that one party cannot in bad faith get in the way of the counterparty's satisfaction of a contract condition that would result in the counterparty's realization of a benefit under the contract. In the Court's view, the following hypothetical demonstrates the principle. If a landowner agrees to pay a painter a $10,000 commission if she completes a "satisfactory" landscape of the landowner's estate, the landowner breaches the covenant of good faith and fair dealing—and thus the contract—if he stops allowing the painter onto his estate after the painter has completed most of the painting; the covenant protects the painter from the argument

that she, not having "completed" a "satisfactory" landscape, is contractually not entitled to a commission.

*Walton v. Interstate Warehousing, Inc*., No. 3:17-CV-1324, 2020 WL 1640440, at *9 (M.D. Tenn. Apr. 2, 2020) (citations omitted). The general idea appears to be that if the defendant, through acts evidencing bad faith or unfair dealing (or at least the absence of good faith and fair dealing), prevents the occurrence of circumstances whereby the plaintiff would become entitled to receive from the defendant the contractual benefits for which the plaintiff bargained,[19] the defendant must provide those benefits to the plaintiff despite the non-occurrence of those circumstances; if the defendant fails to do so, then the defendant is liable for breach. In such circumstances, therefore, showing breach of the implied covenant of good faith and fair dealing is a vital part of the defendant *establishing* the breach of contract even though breach of the implied covenant of good faith and fair dealing is not *itself* the actionable breach of contract.

      With this understanding of the proper role and applicability of the breach of the implied covenant of good faith and fair dealing, the Court next asks what exactly Defendants allegedly did here to interfere with Plaintiff's right to receive the benefits of his implied contract with Defendants? To implicate the covenant of good faith and fair dealing in any sense that adds anything to his breach of contract claim not already present based on the terms of the implied contract, Plaintiff must identify something Defendants have done (beyond breaching one or more terms of the implied contract itself) that gets in the way of Plaintiff achieving—of circumstances reaching the point where Plaintiff has—the right to receive benefits under that contract. The Court does not see where Plaintiff has done any such thing, and so his invocation of the covenant of good faith and fair dealing is for naught.

---

[19] Such would be the case if, for instance (and as indicated in the above example), the defendant prevented the plaintiff from completing the performance necessary for the plaintiff to earn the contractual benefits to which the plaintiff is entitled by virtue of performing under the contract.

For all of these reasons, the Court will dismiss Count IV.

3. *Promissory Estoppel (Count V)*

Under Tennessee law, a claim for promissory estoppel has three elements: "(1) a party made a promise which the promisor should reasonably have expected to induce the action or forbearance of the promisee; (2) the promise does induce that action or forbearance; and (3) injustice can be avoided only by enforcing the promise." *Sifuna*, 2018 WL 3005814, at *2 (citing *Atria*, 142 F. App'x at 256); *Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc*., 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (citation omitted). As the name of the claim suggests, the key element is the promise, *Chavez v. Broadway Elec. Serv. Corp*., 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007), and as a general matter, recovery is not available under the theory of promissory estoppel when a valid express contract exists between the parties. *Jones v. BAC Home Loans Servicing, LP*, No. W2016-00717-COA-R3-CV, 2017 WL 2972218, at *9 (Tenn. Ct. App. July 12, 2017); *Calabro v. Calabro*, 15 S.W.3d 873, 879 (Tenn. Ct. App. 1999) (citing *EnGenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 19-20 (Tenn. App. 1997)). Tennessee does not liberally apply the doctrine of promissory estoppel and limits its application to exceptional cases "verging on actual fraud." *Shedd v. Gaylord Entm't Co*., 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003); *Baliles v. Cities Serv*., 578 S.W.2d 621 (Tenn. 1979).

Defendants argue that Plaintiff's promissory-estoppel claim fails because it is based on the same promises that Plaintiff alleges form the contractual relationship. In Plaintiff's Response, he fails to respond to Defendants' argument that his promissory estoppel claim should be dismissed pursuant to Rule 12(b)(6). And as noted above, "[w]here a party fails to respond to an argument in a motion to dismiss 'the Court assumes he concedes this point and abandons the claim.'" *ARJN*

*#3*, 517 F. Supp. 3d at 750; *see also Bredesen*, 507 F.3d at 1007-08. Accordingly, the Court will grant Defendants' Motion with respect to Plaintiff's promissory estoppel claim.

4. *Negligent Misrepresentation (Count VI)* & *Negligent Infliction of Emotional Distress (Count VII)*

To make out a claim of negligent infliction of emotional distress ("NIED") in Tennessee, a plaintiff must:

> (1) satisfy the five elements of ordinary negligence: duty, breach of duty, injury or loss, causation in fact, and proximate or legal cause; (2) establish a "serious" or "severe" emotional injury; and (3) support his or her serious or severe injury with expert medical or scientific proof. A "serious" or "severe" emotional injury is one that occurs where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.

*Marla H. v. Knox Cty.*, 361 S.W.3d 518, 529 (Tenn. Ct. App. 2011) (internal citations and quotation marks omitted).

To make out a claim of negligent misrepresentation under Tennessee law, a plaintiff must prove: (1) "the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest"; (2) "the defendant supplies faulty information meant to guide others in their business transactions"; (3) "the defendant fails to exercise reasonable case in obtaining or communicating the information"; and (4) "the plaintiff justifiably relies upon the information." *Dixon v. Producers Agric. Ins. Co*., 198 F. Supp. 3d 832, 837 (M.D. Tenn. 2016) (citing *Robinson v. Omer*, 952 S.W.2d 423 (Tenn. 1997)). Additionally, Tennessee law requires that "the false representation [be made] either knowingly or without belief in its truth or recklessly [with regard to its truth]." *Id*. at 838 (citing *Metro. Gov't v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)).

Defendants argue that both of Plaintiff's negligence-based claims should be dismissed because (according to Defendants) his "negligence[-based] claims are subsumed by his contract

claims." (Doc. No. 32 at 24). Defendants point out that Plaintiff alleges that Defendants breached their contractual duties:

> (a) by failing to provide him with accurate advice about accommodations available to him; (b) by failing to provide him with timely accommodations for course work and clinical rotations as required by the ADA; and (c) by requiring him to complete additional assignments along with the work required in his course remediation. No other students in the course had to complete this additional work.

(*Id*. at 24 (citing Doc. No. 22 at ¶ 134)). According to Defendants, Plaintiff "repackaged those same contractual complaints as allegations of negligence" when he alleged:

> Defendant negligently supplied false and misleading information regarding VUSM to Plaintiff in failing to exercise reasonable care or competence in communicating information about VUSM's medical program, its accommodations, its faculty, the Plaintiff's options for remediation and withdraw, and VUSM's ability to assist and support Plaintiff in completing his required coursework, clinical work, and exams.

> Defendant breached its duty of care when it failed to inform the Plaintiff of all disability options available to him as a student with a registered disability under VUSM's medical degree program.

(*Id*. at 24-25 (citing Doc. No. 22 at ¶¶ 148, 153)).

Defendants argue that "Plaintiff cannot assert [that] the same conduct is both a breach of contract and a tort," because "'[i]t is well settled law that a tort cannot be predicated on a breach of contract. A tort exists only if a party breaches a duty which he owes to another independently of the contract.'" (*Id*. at 25 (quoting *Calipari v. Powertel, Inc*., 231 F. Supp. 2d 734, 736 (W.D. Tenn. 2002))). Therefore, Defendants argue that the Court should dismiss Plaintiff's negligent misrepresentation and negligent infliction of emotional distress claims, because (according to Defendants) Plaintiff did not allege that Defendants owed him any duty separate from their implied contract. (*Id*.).

In response, Plaintiff argues that his "negligence claims are pled in addition to [his] contract claims." (Doc. No. 37 at 24). Plaintiff asserts that Defendants breached a duty owed independently of the contract, because

> When Defendants assumed the treatment of Plaintiff's mental health care, a duty of care arose from the doctor-patient relationship. Defendants' assumption of care created a duty to Plaintiff that would exist even if no contract existed. Plaintiff was denied services and rights enumerated in Vanderbilt's *Patient Rights and Responsibilities*, as Defendants did not allow Plaintiff to participate in decisions regarding his care and take his objections into account when prescribing mental health treatment. FAC ¶ 58. (Ex. 7). Second, Defendants' misrepresentations included those made by Dr. Lomis to the Plaintiff. Dr. Lomis represented to the Plaintiff that his absences would be excused due to his mental health evaluations conducted by PCC, a department of the Defendants. Id. at ¶ 81. (Ex. 13). Defendants' actions proximately caused Plaintiff's injury and not only the loss of Plaintiff's bargain.

(Doc. No. 37 at 25). Thus, Plaintiff asserts that his "contract claims are separate and apart from his claims of negligence against the Defendants." (*Id.*). He contends that "[w]hile the two claims share facts, they are operationally different as Plaintiff's contract claims concern Defendants' contractual breaches and Plaintiff's negligent misrepresentation claims concern Defendants' breach of their duty as professional medical health providers to Plaintiff." (*Id.*). Thus, Plaintiff maintains that his negligence claims survive Defendants' Motion.

In Reply, Defendants argue that although "a plaintiff may plead tort and contract claims in the alternative, he does not do so when he expressly incorporates the allegations about the existence of a contract into his negligence claim." (Doc. No. 38 at 5 (citing *Goldstein v. Home Depot U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2009))). Defendants assert that Plaintiff's negligence claims fail because he "does not allege Vanderbilt breached any duty toward Plaintiff apart from its alleged contractual obligations." (*Id.*). Additionally, to the extent Plaintiff now maintains that a duty arose from the doctor-patient relationship, Defendants argue that

> Plaintiff has not pled a medical malpractice claim, or asserted claims relating to allegedly improper medical care. Instead, the basis of his lawsuit is that Vanderbilt's faculty and administration failed him as a student. Plaintiff cannot conflate his separate relationships. Nor can he use his response brief to a dispositive motion to re-amend his complaint to assert a theory based on his status as a patient rather than his role as a student.

(Doc. No. 38 at 5).

The Court agrees with Defendants that Plaintiff has not alleged a breach of any duty that arose outside of the contractual relationship that Plaintiff alleges. Here, he expressly incorporates his allegations regarding breach of contract into his negligence claim. (*See* Doc. No. 22 at ¶ 131 ("Plaintiff's relationship with Defendants is contractual in nature, both express and implied."). And the Court explained above that the student-university relationship creates an implied-in-fact contract. Plaintiff further alleges that Defendants were negligent when they "breached [their] duty of care when it failed to inform the Plaintiff of all disability options available to him as a student with a registered disability under VUSM's medical degree program" which is the same conduct whereby (according to Plaintiff's allegations) Defendants breached the contractual relationship. (*Compare* Doc. No. 22 at ¶ 134, with *id*. at ¶¶ 148, 153). Plaintiff's allegations of negligence are, just as Defendants label them, merely repackaged from his breach-of-contract allegations. *See also Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992) (dismissing negligence claims because alleged damages arose from breach of contractual relationship and stating "the alleged claim for negligence sounds in contract, and dismissal was proper"); *see also Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727, 728 (Tenn. Ct. App. 1980) ("[I]t matters not a whit whether the breach was an intentional one or an unintentional one caused by negligence in attempting to perform. The action still remains in contract."); *America's Collectibles Network, Inc. v. Sterling Commerce (America), Inc*., 3:09-cv-143, 2016 WL 9132294, at *19 (E.D. Tenn. Sept. 7, 2016) ("Under Tennessee law . . . [w]here the

only duty alleged arises from a contractual obligation, its breach cannot form the basis of a parallel negligence claim."). Therefore, the Court will grant Defendants' Motion as to Plaintiff's NIED claim.

## CONCLUSION

For the above-stated reasons, Defendants' Motion to Dismiss (Doc. No. 31) will be GRANTED, and the Clerk will be directed to close the case.

An appropriate Order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE